IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ISOSCELES HOLDING, LLC, d/b/a VENTURI RESTORATION,<br><br>      Plaintiff,<br>  v.<br><br>ALLIANCE ENVIRONMENTAL GROUP, LLC, BRANDYN CARROLL, OLIVIA JOHNSON, and NATHAN KAZLAUSKAS,<br><br>      Defendants. | Case No.: 3:23-cv-01004-AN<br><br>OPINION AND ORDER |

Plaintiff Isosceles Holding, LLC, d/b/a Venturi Restoration ("Venturi"), filed this Motion for Temporary Restraining Order, ECF [2]. Oral arguments were held on July 14, 2023, with plaintiff and defendant Alliance Environmental Group, LLC ("Alliance") present. Defendants Brandyn Carroll, Olivia Johnson, and Nathan Kazlauskas ("Former Employees") were not present. During oral arguments, Alliance moved to strike the Declaration of Clarence Parrotte, ECF [29], and the Second Declaration of Derek Middleton, ECF [27]. For the reasons outlined below, Venturi's Motion for Temporary Restraining Order is GRANTED in part and DENIED in part, and Alliance's Motions to Strike are DENIED.

## LEGAL STANDARDS

### A.    Motion to Strike

Under Federal Rule of Civil Procedure 12(f), a party may move to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." In general, "[m]otions to strike are disfavored and infrequently granted." *Legal Aid Servs. Of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008). When considering a motion to strike, the court "must view the pleadings in the light most favorable to the pleading party." *Scott v. PacifiCorp*, No. 1:22-cv-00174-AA, 2022 WL 22452281, at *1 (D. Or. July 6, 2022).

### B.    Temporary Restraining Order

A temporary restraining order ("TRO") is subject to substantially the same factors as a

preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Generally, a plaintiff seeking a preliminary injunction must show: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest. *Id.* at 20.

The Ninth Circuit also employs a "serious questions" test which dictates that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Thus, under the serious questions test, a preliminary injunction can be granted if there is a likelihood of irreparable injury to the plaintiff, serious questions going to the merits, the balance of hardships tips in favor of the plaintiff, and the injunction is in the public interest. *M. R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

A TRO issued without notice to the opposing party may not exceed 14 days and may be extended by the court one time for an additional 14 days if good cause is shown. Fed. R. Civ. Pro. 65(b)(2). If the parties do not consent to an extension, then the court must schedule a preliminary injunction hearing to occur within 28 days after the date that the TRO is first issued. *Id.*

## BACKGROUND

### A.    The Parties

Plaintiff Venturi is a commercial and residential disaster recovery and environmental restoration, remediation, and reconstruction corporation that services multiple states, including Washington, Oregon, California, and Arizona. Compl. ECF [1] at 2. It operates across multiple industries, including working for property management companies, fulfilling insurance referrals, and supporting governmental entities. *Id.* Defendant Alliance operates in the same territories as Venturi and, prior to June 2023, acted as Venturi's subcontractor in the limited capacity of the abatement of environmental toxins. *Id.*

Venturi hired defendant Carroll in September 2021 as a construction manager in Seattle, Washington. *Id.* at 10. In April 2023, Carroll moved to Portland, Oregon to become Venturi's office general manager. *Id.* As the office general manager, Carroll worked directly with Venturi customers, visited Venturi job sites, was responsible for client relations, sales, project and employee management, and the health of the Portland office. *Id.* Carroll had access to Venturi's customer relationship management database ("DASH"), which included the identity of and contact information for all Venturi customers, budgets and estimates, property details, work orders and repeat work assignments, job size and billings, pricing and discounts, collections issues and more. Pl. Motion for TRO ECF [2] at 7. On June 1, 2023, Carroll resigned from Venturi to work for Alliance as a branch manager at Alliance's Portland office. Compl. ECF [1] at 10.

Venturi hired defendant Kazlauskas in August 2021 as a senior operation manager in Seattle, Washington. *Id.* at 11. In March 2022, Kazlauskas was promoted to Venturi Regional Vice President of the West Coast. *Id.* Kazlauskas then moved to Missouri until Venturi paid for him to relocate back to Washington on May 16, 2023. *Id.* On June 2, 2023, Kazlauskas resigned to work for Alliance in a similar position to that which he held at Venturi. *Id.* at 12. At the time of his resignation, Kazlauskas had approximately ten direct reports and supervised around 100 employees; all West Coast regional managers at Venturi reported to Kazlauskas; Kazlauskas attended all West Coast region weekly production meetings where management reviewed all current jobs that Venturi was working on, accounts receivable, and problems with collections; Kazlauskas had access to DASH; and Kazlauskas also managed all West Coast regional customer or third-party administrator program escalations. Pl. Motion for TRO ECF [2] at 6. Additionally, Venturi paid for Kazlauskas to travel extensively to meet with customers, oversee different offices' operations, and participate in trade shows. *Id.*

Venturi hired defendant Johnson as an estimator in Portland, Oregon. Compl. ECF [1] at 12. In the course of her employment, Johnson developed client relationships with Venturi customers and project estimates and budgets for Venturi mitigation customers. Pl. Motion for TRO ECF [2] at 8. On June

3

2, 2023, Johnson resigned from Venturi to work for Alliance in a similar position to that which she held at

Venturi.  Compl. ECF [1] at 12.

**B.**     **Factual Underlying Venturi's Claims**

Each of the Former Employees executed a Confidentiality Agreement as a condition of

their employment with Venturi.  *Id.* at 5.  The Confidentiality agreements restricted the Former Employees'

use and disclosure of Venturi's confidential information and trade secrets and restricted the Former

Employees from soliciting Venturi customers or employees during their employment and for a period of

one year after their employment ended.  *Id.* at 5-8.

Plaintiff presented evidence that in March 2023, Kazlauskas set up calls between Venturi

employees and Kelly Kambs ("Kambs"), Alliance's CEO.  Decl. of Justin Sellers ("Sellers Decl.") ECF [6]

¶ 7; 2d Decl. of Derek Middleton ("2d Middleton Decl.") ECF [31] Ex. D.  The evidence suggests that

Kazlauskas used his Venturi work phone to solicit Venturi employees to join Alliance on at least two

occasions, and that Kazlauskas set up calls between Kambs and Venturi employees on at least four

occasions.  Sellers Decl. ¶ 7; 2d Middleton Decl. Ex. D.  Further, Kazlauskas allegedly joined at least one

call between a Venturi employee and Kambs.  Sellers Decl. ¶ 7.  While setting up these calls, Kazlauskas

told Venturi employees, "I can't technically recruit you."  *Id.*  Kazlauskas contends that although Venturi

employees reached out to him about wanting to leave Venturi, he did not solicit this contact.  Decl. of

Nathan Kazlauskas ECF [23] ¶ 10.

On May 25, 2023, Carroll and Johnson used their Venturi email accounts to correspond

with two Alliance employees regarding a project that Alliance was completing on a subcontractor basis for

a Venturi customer.  Decl. of Derek Middleton ("Middleton Decl.") ECF [5] Ex. L.  Venturi alleges that it

has no record of this project in its systems and alleges that Alliance and the Former Employees conspired

to take this project for Alliance.  *Id.* ¶ 31, Ex. M; 2d Decl. of Caleb Parrotte ("2d Parrotte Decl.") ECF [28]

¶ 2.  Kambs alleges that Alliance's records reflect that this project was completed on a subcontractor basis.

Decl. of Kelly Kambs ECF [24] ¶ 4.

On June 9, 2023, Venturi's counsel sent a cease-and-desist letter to Alliance's general

counsel, demanding that Alliance cease and desist from interfering with Venturi's Confidentiality Agreements with its former employees, from soliciting Venturi's employees and customers, and from misappropriating Venturi's confidential information.  Decl. of Zana Bugaighis ("Bugaighis Decl.") ECF [3] Ex. A.  Venturi's counsel sent similar letters to Kazlauskas and Carroll on June 9, 2023, and June 15, 2023, respectively.  *Id.* Ex. C, E.  Alliance's general counsel did not, and has not, provided written notice of compliance with Venturi's demands; however, Alliance's general counsel did acknowledge receipt of Venturi's letter.  *Id.* Ex. D.

On June 22, 2023, a Venturi manager visited the job site of an ongoing Venturi project and witnessed Johnson speaking to the relator on the house about the mold remediation in the attic.  Middleton Decl. ¶ 32, Ex. N.  Johnson was no longer employed by Venturi at the time, but she had written the original estimate of loss for the project on behalf of Venturi.  *Id.*

On June 23, 2023, Venturi received forensic analysis results which revealed that Carroll used his Venturi computer, without authorization, to access Venturi documents after he had resigned, but before he returned the computer to Venturi.  Pl. Motion for TRO ECF [2] at 12-13.  On May 30, 2023, Carroll accessed multiple Google Sheets (the "spreadsheets") belonging to Venturi, including spreadsheets named "Venturi Staff Worksheet," "PDX Structure Schedule," and "PDX Mitigation Spreadsheet."  *Id.* at 13-14.  The spreadsheets listed detailed information regarding ongoing Venturi projects in the Portland, Oregon region.  *Id.*  On May 31, 2023, without authorization, Carroll transferred control of six of the spreadsheets from his Venturi employee email address to his personal email address.  Middleton Decl. ¶ 27, Ex. F.  Kazlauskas had already been using his personal email address to access the spreadsheets, and was the owner of some of the spreadsheets; however, he did not transfer his ownership when he resigned. Pl. Motion for TRO ECF [2] at 13.  As a result, both Carroll and Kazlauskas can still access the spreadsheets while working at Alliance, and Venturi cannot block their access to the spreadsheets because it is not the administrator on the account.  *Id.*

Venturi immediately contacted Alliance's general counsel to demand the return of all misappropriated confidential information (namely, the spreadsheets).  Bugaighis Decl. Ex. D.  Alliance

informed Venturi on June 26, 2023, that it did not represent Carroll.  *Id.*  Venturi subsequently contacted

Carroll to demand that he cease and desist from further accessing the spreadsheets, immediately return

control of the account to Venturi, and preserve all documents and communications associated with his

acquisition of the spreadsheets.  *Id.* at Ex. E.  Carroll did not respond.  *Id.*  Although Alliance indicated that

it would assist with Carroll's return of the spreadsheets, Venturi has not yet obtained access to them.  *Id.*

Ex. D.  Carroll has attested that he agrees to relinquish control of the spreadsheets and is attempting to do

so.  Decl. of Brandyn Carroll ECF [25] ¶¶ 7-9.

On June 30, 2023, a Venturi customer mistakenly emailed Kazlauskas and another former

Venturi employee (who is not a party in this case) at their Venturi email accounts to discuss a bid from

Alliance and the Former Employees for a mitigation project.  Middleton Decl. ¶ 33, Ex. O.

On July 7, 2023, Venturi filed its complaint and this Motion for Temporary Restraining

Order.  Alliance responded to the motion, and oral argument was held on July 14, 2023.  Alliance appeared

at oral arguments, but the Former Employees did not.

## DISCUSSION

**A.    Motions to Strike**

1.    *Declaration of Clarence Parrotte*

During oral arguments, Alliance moved to strike the Declaration of Clarence Parrotte,

arguing that it is based entirely on hearsay and that there is no allegation that Alliance authorized the

conduct that was allegedly overheard.  Specifically, Alliance seeks to exclude paragraph three, which states:

> "As [Eddie] Lovell and I were approaching my work van, we passed by an Essex employee
> talking to former Venturi employee, Harold Segar.  As I walked by them, I overheard Segar
> telling this Essex employee how strong Alliance has grown and how Alliance had just
> purchased another company, but I could not make out which company he named."

Hearsay is an out of court "statement that . . . a party offers in evidence to prove the truth of the matter

asserted in the statement."  Fed. R. Evid. 801(c)(2).

Venturi argues that the declaration is admissible because (1) it describes an event that Mr.

Parrotte personally observed, and (2) its contents are not hearsay under the opposing party statement

exclusion. *Id.* 801(d)(2)(D) (noting that a statement is not hearsay if the statement "offered against an opposing party . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]").  The opposing party statement exclusion applies if "(1) the statement [is] made by an agent or employee of the party against whom the statement is being offered; (2) the statement concern[s] a matter within the scope of that employment relationship; and (3) the statement [is] made while the declarant is yet employed by the party." *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 999 (9th Cir. 2019).

Generally, "the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). On its face, the information contained within the declaration is likely hearsay because it contains out-of-court statements offered for the truth of the matter asserted.  Although Venturi does not directly allege that the speaker, Harold Segar, was an Alliance employee at the time the statements were made, the statements occurred on June 13, 2023, and Mr. Segar had resigned from Venturi by June 5, 2023.  Decl. of Caleb Parrotte ECF [4] ¶ 11.  At this stage, Venturi's allegations are sufficient to show that the statements contained in Mr. Parrotte's declaration were made by an Alliance employee.

Although plaintiff has not alleged that the statement concerned a matter within the scope of the employment relationship, Mr. Segar worked for Venturi as a mitigation estimator.  2d Parrotte Decl. ¶ 3.  It is reasonable to infer that this job would require Mr. Segar to contact potential clients regarding projects.  Thus, given the less strict application of the rules of evidence at this stage of the case, the Court infers that Mr. Segar's statements concerned a matter within the scope of his employment relationship with Alliance.

Because the evidence presented at this stage could support plaintiff's contention that the statements within Clarence Parrotte's Declaration are not hearsay under the opposing party statement exclusion, Alliance's Motion to Strike the Declaration of Clarence Parrotte is denied.

2.    *Second Declaration of Derek Middleton*

During oral arguments, Alliance also moved to strike the Second Declaration of Derek

Middleton, arguing that it introduces new evidence about a subcontractor agreement between Venturi and a third-party company, Thermatech Northwest, Inc. ("Thermatech"), which was not contained in either the complaint or Venturi's motion for TRO. Further, Alliance argues that the declaration seeks to broaden the scope of the TRO after the fact and raises additional allegations that were not initially disclosed about a former Venturi employee who is not a named party in the case. Venturi argues that the declaration should not be struck because it contains evidence that is properly within the scope of what was pled in the complaint, and the scope of the TRO. Venturi further argues that because Thermatech was acquired by Alliance, Alliance is bound by the subcontractor agreement.

The Court finds that the Second Declaration of Derek Middleton is not immaterial, redundant, impertinent, or scandalous. Although the evidence presented in the declaration is not directly alleged in the complaint, it is relevant to Venturi's claims. Alliance acquired Thermatech only a week after Thermatech entered into the 2021 Subcontractor Agreement, and Thermatech continued to perform under the subcontractor agreement after the acquisition. Thus, which companies that Thermatech serviced under the 2021 Subcontractor Agreement is relevant to Venturi's allegations that Alliance is now servicing those same companies directly. For these reasons, Alliance's Motion to Strike the Second Declaration of Derek Middleton is denied.

**B.    Temporary Restraining Order**

1.    *Likelihood of Success on the Merits*

Venturi brings seven claims in total: three against all defendants, one against all Former Employees, two solely against Carroll, and one against Carroll and Kazlauskas. The Court assesses Venturi's likelihood of success on the merits of each claim in turn.

a.    Breach of Contract – All Defendants

Venturi bases its breach of contract claim against the Former Employees on the Confidentiality Agreements they each entered. Sections 1.1 and 1.2 of the Confidentiality Agreements state:

"During and after Employee's employment with the Company, Employee will protect and hold in strictest confidence all Confidential Information of the Company, its clients and business relations. Confidential information may be of a technical or business nature and

includes, without limitation, trade secrets, plans and prospects for new or modified services, service know-how and implementation, innovation, programs, reports, studies, methods, customer and supplier lists, customer service requirements, customer projects, any information provided by a customer or business relation, costs of providing services, operating costs, pricing structures, bids, business prospects and plans, training programs and manuals, marketing or business plans, bidding techniques, and sales and marketing materials and strategies.
. . . . .
"The Employee shall preserve in confidence and shall not disclose, use, share, copy, publish, summarize or remove, either during or after the term of Employee's employment, any confidential information, except as required in Employee's work for the Company or as authorized in writing by the Company in each instance.  Upon termination of the Employee's employment with the Company, or upon request of the Company at any time, the Employee shall deliver to the Company all forms of materials in Employee's possession or control that contain or embody any Confidential Information and shall purge or otherwise destroy all Confidential Information not capable of being returned."

The Confidentiality Agreements also contain a non-competition and non-solicitation clause in Section 2.2:

"Employee agrees that during Employee's employment by Company and for twelve (12) months after termination of such employment for any reason . . . .
"Employee will not call on, reveal the name of, or otherwise solicit, accept business from or attempt to entice away from the company any actual or identified potential customer of Company, nor will Employee assist others in doing so.  Employee further agrees that Employee will not, during the Noncompete Period, encourage or solicit or assist others to encourage or solicit any other employee or consultant of Company to leave such employment for any reason."

Venturi argues that the Former Employees each violated the non-solicitation and non-disclosure provisions of their Confidentiality Agreements.  Although counsel for Alliance does not represent the Former Employees, Alliance argues that the contracts are governed by Washington law and are unenforceable against Carroll and Johnson because neither individual was paid enough to enforce the provision.  In the alternative, Alliance argues that if Oregon law applies, the customer non-solicitation provisions are unenforceable because they are overbroad and are considered non-compete provisions.

The first issue is whether Oregon or Washington law applies.  "When sitting in diversity, [federal courts] apply the choice-of-law rules of the forum state."  *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012).  Under Oregon choice-of-law rules, the court must first determine whether there is a material difference between Oregon law and the law of the other forum.  *Waller v. Auto-Owners Ins. Co.*, 174 Or. App. 471, 475, 26 P.3d 845 (2001).  Where no material difference exists, Oregon courts apply Oregon law without regard to the relative significance of the relationship between the dispute and the

proposed alternative forum.  *Id.*  If there is a material difference, the court must determine whether both states have substantial interests in having their laws applied.  *Pulido v. United Parcel Serv. Gen. Servs. Co.*, 31 F. Supp. 2d 809, 813 (D. Or. 1998).  It is the burden of the party advocating the application of a different jurisdiction's law to identify material differences between that jurisdiction's law and Oregon's, and Oregon courts will apply Oregon law if no party identifies any material distinctions, without regard to whether such distinctions in fact exist.  *Angelini v. Delaney*, 156 Or. App. 293, 300, 966 P.2d 223 (1998).

There is not a substantial difference between Washington's and Oregon's non-compete agreement statutes.  Both statutes specifically exempt non-solicitation agreements.  *See* Wash. Rev. Code § 49.62.010(4) (2019) (exempting non-solicitation agreements, confidentiality agreements, and covenants prohibiting use or disclosure of trade secrets or inventions, among others, from definition of non-competition agreements); *id.* § 49.62.010(5) (defining non-solicitation agreement as "agreement between an employer and employee that prohibits solicitation by an employee, upon termination of employment: (a) Of any employee of the employer to leave the employer; or (b) of any customer of the employer to cease or reduce the extent to which it is doing business with the employer"); Or. Rev. Stat. § 653.295 (exempting "[a] covenant not to solicit employees of the employer or solicit or transact business with customers of the employer" from non-compete agreement statutory requirements).

Although Alliance argues that the non-solicitation provisions are substantively non-compete provisions, they cover the type of actions contemplated by the non-solicitation definitions in both the Oregon and Washington statutes.  That is, the non-solicitation provisions in the Confidentiality Agreements are an agreement between the employer and employee that the employee will neither solicit other employees of the employer to leave the employer, nor solicit any customer of the employer to cease or reduce the extent to which it is doing business with the employer.  Because Alliance has not identified a material difference between Oregon law and Washington law, Oregon law applies.

Under Oregon law, to state a viable claim for breach of contract, a plaintiff must allege: (1) the existence of a specific contract and its relevant terms; (2) plaintiff's full performance of the contract; (3) defendant's breach of the contract; and (4) damages to plaintiff resulting from the breach.  *Acrymed,*

*Inc. v. Convatec*, 317 F. Supp. 2d 1204, 1215 (D. Or. 2004).  As for the Former Employees, Venturi has

presented adequate evidence of the existence of a specific contract and its relevant terms, and of Venturi's

full performance of the contract.  Venturi has presented adequate evidence of a breach of contract in the

following manners: (1) Carroll retained copies of, and control of, the spreadsheets containing confidential

information, in violation of Section 1.2 of the Confidentiality Agreement; (2) Johnson attempted to solicit

Venturi customers after she was no longer a Venturi employee in violation of Section 2.2 of the

Confidentiality Agreement; and (3) Kazlauskas solicited Venturi customers while working at Alliance, and

solicited Venturi employees to leave Venturi, in violation of Section 2.2 of the Confidentiality Agreement.

Finally, Venturi has provided adequate proof of damages resulting from these alleged breaches through loss

of customer goodwill and monetary losses.  Therefore, Venturi has presented adequate evidence to prove a

likelihood of success on the merits on its breach of contract claim against the Former Employees.

 As for Alliance, Venturi asserts a breach of contract claim under the 2019, 2021, and 2023

Subcontractor Agreements. The 2023 Agreement was entered into by Venturi National Services, LLC, on

its own behalf and on behalf of its corporate affiliates, and by Alliance Environmental Group, LLC, and

states:

> "14.1 Subcontractor acknowledges and agrees that information contained in the
> Contract Documents, including but not limited to all assigned Worker Order(s) is
> proprietary ("Proprietary Information").  Subcontractor further acknowledges and agrees
> that during the term of this Agreement, Subcontractor will be entrusted with and has access
> to information and materials belonging to [Venturi] that are important to the success and
> competitiveness of [Venturi's] business ("Confidential Information").  Confidential
> information includes but is not limited to information relating to individuals and entities
> that are past, current, and prospective customers of [Venturi] and includes any
> communication in any medium written, telephonic, electronic or otherwise, Work site
> locations, system design and testing and maintenance requirements.  This Confidential or
> Proprietary Information is hereby acknowledged by all parties to be trade secrets and is
> subject to all applicable law as well as this Agreement."
> "14.2 Confidential Information and Proprietary Information shall be kept private by
> Subcontract and shall not be used or disclosed by Subcontractor for any purpose except as
> is necessary to Subcontractor's performance of work authorized by a Work Order, as
> otherwise permitted in writing by [Venturi], or as required by a court of competent
> jurisdiction. . . . Upon the termination of this Agreement for any cause, Subcontractor shall
> continue to maintain as private and privileged all Proprietary Information and Confidential
> Information for a period of three (3) years from the termination date.  [Venturi] shall be
> entitled to obtain injunctive relief against Subcontractor enjoining and restraining any
> unauthorized disclosure or use of Proprietary Information or Confidential Information.

"14.3 Subcontractor hereby agrees that while this agreement is in effect and for a period of two (2) years after the Agreement is terminated, Subcontractor and its officers, directors, agents, members or employees shall not directly or indirectly, without written consent of [Venturi], solicit or accept business from any contact or business relationship of any kind with any [Venturi] customer serviced by Subcontractor for [Venturi]."

The 2019 Subcontractor Agreement was entered into by Response Team 1 National Services, LLC ("RT1NS"), both on its own behalf and on behalf of its corporate affiliates, and by Alliance Environmental Group, LLC.  This agreement contained the same three provisions outlined above, except for Section 14.2.

The 2021 Subcontractor Agreement was entered into by Venturi National Services, LLC, on its own behalf and on behalf of its corporate affiliates, and by Thermatech Northwest, Inc.  That agreement contains the same provisions stated above, with the exception that Section 14.3 states: "Subcontractor hereby agrees that while this agreement is in effect and for a period of one (1) year after the Agreement is terminated, . . . ."

i.      *Standing to Enforce Subcontractor Agreements*

Venturi alleges that Alliance breached Section 14.3 of the 2019, 2021, and 2023 Subcontractor Agreements.  While neither party disputes that Venturi has standing to enforce the 2023 Agreement, Alliance argues that neither the 2019 nor the 2021 Agreements are enforceable against it.

As for the 2019 Agreement, Alliance argued at oral argument that it is not enforceable because it was between RT1NS and Alliance, not between Venturi and Alliance.   The 2019 Agreement states that it is between RT1NS and its corporate affiliates, and Alliance.   An affiliate is "a company effectively controlled by another or associated with others under common ownership or control." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).  Venturi has presented adequate evidence that RT1NS was an affiliate of Venturi at the time of the 2019 Agreement.  Therefore, Venturi has standing to enforce the contract.

As for the 2021 Agreement, Alliance argues it is not enforceable against Alliance because it was between Venturi and Thermatech, not between Venturi and Alliance, and there is no evidence that Alliance stepped into the shoes of Thermatech for the 2021 Agreement.   Venturi argues that 2021

Agreement is enforceable against Alliance because Alliance acquired Thermatech a week after the 2021 Agreement was signed, and Thermatech continued to operate under the 2021 Agreement as a subsidiary of Alliance.

It is not clear precisely what theory Venturi is alleging for why Alliance would be liable for a contract entered into by Thermatech. "Generally a corporation which owns and controls another is not responsible for the liabilities of the latter." *G. E. J. Corp. v. Uranium Aire, Inc.*, 311 F.2d 749, 756 (9th Cir. 1962). Plaintiff has provided no evidence that, in acquiring Thermatech, Alliance intended to, or did, assume Thermatech's contractual obligations and liabilities under the 2021 Agreement. Further, nothing in the 2021 Agreement indicates that Venturi intended to contract with Thermatech *and* its affiliates; rather, the 2021 Agreement states only that it is with "Thermatech Northwest Inc." Absent language indicating an intent to contract with Thermatech and its future affiliates, the 2021 Agreement cannot be enforced against Alliance. *See Revitch v. DIRECTV, LLC*, 977 F.3d 713, 718 (9th Cir. 2020) (holding that wireless service agreement between AT&T and consumer could not be enforced by DIRECTV where DIRECTV was acquired by AT&T after agreement was entered into).

ii.     *Alleged Breaches of the Agreements*

As an initial matter, the parties dispute whether the 2023 Agreement includes all clients that Alliance serviced under the 2019 Agreement. The 2023 Agreement states, "This Agreement comprises the full and entire agreement between the parties and no other agreement or understanding of any nature has been entered into or will be recognized. All negotiations, acts, work performed, or payments made prior to the execution thereof, shall be deemed merged in, integrated and superseded by this Agreement." Whether an original agreement is superseded by or merged into a subsequent agreement is a question of fact. *Smith v. Harris*, 259 Or. 31, 36, 484 P.2d 1100 (1971). On its face, the integration clause implies that the 2023 Agreement superseded the 2019 Agreement. Thus, Alliance would not be barred from performing work for clients that it serviced as a subcontractor under the 2019 Agreement.

However, whether the 2023 Agreement terminated the 2019 Agreement is inapposite to determining if Alliance is prohibited from servicing Venturi customers that it performed subcontractor work

for under the 2019 Agreement. Section 14.3 of the 2019 Agreement provides that Alliance will not "solicit or accept business from any contact or business relationship of any kind with an RT1NS customer serviced by [Alliance] for RT1NS" for a period of two (2) years after the contract is terminated. Thus, even if the 2023 Agreement terminated the 2019 Agreement, the two-year non-solicitation provision would remain in effect from the date of termination.

The scope of clients serviced by Alliance for Venturi under the 2019 Agreement is also disputed by the parties. While Alliance asserts that it is only prohibited from soliciting customers that Alliance itself serviced, Venturi argues that Alliance is prohibited from soliciting any customers that it, or Thermatech, serviced for Venturi. For the same reasons outlined above, the 2019 Agreement covers only those customers that Alliance serviced. Although Venturi argues that Thermatech *is* Alliance now that Alliance has acquired it, the contractual language of the 2019 Agreement is clear: RTN1S, and its affiliates, contracted solely with Alliance. It did not contract with Alliance, *and its affiliates*, let alone Alliance's future affiliates. Further, Venturi has not presented adequate evidence that Thermatech is the same entity as Alliance. Plaintiff has not presented evidence that Thermatech was absorbed by Alliance, or that it ceases to function as its own independent entity, albeit under the Alliance umbrella.

In sum, Venturi must demonstrate a breach of either the 2019 Agreement or the 2023 Agreement by showing that Alliance solicited a Venturi customer that Alliance serviced as a subcontractor on behalf of Venturi. Venturi has not presented evidence of such solicitation or service. The customers that Venturi has pointed to as being solicited or serviced by Alliance in violation of the Subcontractor Agreements are all customers that were serviced by Thermatech. Therefore, Venturi has not shown a likelihood of success on the merits of its breach of contract claim against Alliance.

b.    Intentional Interference with Contractual Relations – All Defendants

Venturi brings an intentional interference with contractual relations claim against all defendants. Under Oregon law, an intentional interference with contractual relations claim requires: "(1) the existence of a professional or business relationship . . ., (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5)

a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

Venturi alleges that it entered into contractual agreements with all its employees, and that defendants knew that all Venturi employees were subject to valid contractual obligations of confidentiality and customer and employee non-solicitation.  Venturi alleges that defendants intentionally interfered with Venturi's contractual relations with its employees by inducing Venturi employees to breach the terms of their employment contracts and by misappropriating Venturi's confidential and proprietary information and trade secrets.  Venturi alleges that it has suffered damages as a result of defendants' interference.

Alliance argues that it was not aware that the Former Employees had contractual post-employment obligations to Venturi until June 9, 2023.  Alliance asserts that, prior to hiring the Former Employees, Alliance had asked them if they had non-compete provisions or other restrictions, and that the Former Employees had confirmed that they did not remember signing anything with such provisions. Further, Alliance argues that upon learning of the agreements, it confirmed to Venturi its commitment to have its employees comply with the agreements.  Alliance argues that merely hiring a competitor's contractually-bound employee is insufficient to show that the competitor acted with an improper purpose.

Venturi has presented sufficient evidence that Kazlauskas tortiously interfered with Venturi's contractual relations by encouraging Venturi employees to leave their positions in favor of positions with Alliance.  However, Venturi has not provided sufficient evidence that defendants Carroll, Johnson, or Alliance tortiously interfered with Venturi's contractual relations.  Although Venturi alleges that Alliance induced Venturi employees to breach the non-solicitation and confidentiality provisions of their Confidentiality Agreements, Venturi has not provided evidence of such inducement aside from the mere fact that Alliance hired former Venturi employees.  Further, Venturi has not presented evidence indicating that Carroll and Johnson induced Venturi employees to leave Venturi.  Absent such evidence, Venturi does not have a likelihood of success for a tortious interference claim against Carroll, Johnson, or Alliance.

      c.      Intentional Interference with Prospective Economic Advantage – All Defendants

Venturi also alleges intentional interference with prospective economic advantage against all defendants. The elements of that claim are the same as an intentional interference with contractual relations claim. *See Allen v. Hall*, 328 Or. 276, 974 P.2d 199 (1999). Venturi alleges that defendants intentionally interfered with Venturi's prospective economic advantage through improper means by misappropriating Venturi's confidential and proprietary information and inducing Venturi's former employees to solicit Venturi's customers in violation of their Confidentiality Agreements. Venturi further alleges that defendants intended, or knew, that disruption of these relationships was substantially certain to occur as result of their conduct.

Venturi has presented sufficient evidence that the Former Employees tortiously interfered with Venturi's prospective business advantage through improper means by using Venturi's confidential and proprietary information to solicit Venturi customers while employed by Alliance. However, Venturi has not presented sufficient evidence that Alliance has tortiously interfered with Venturi's prospective business advantage through improper means. Again, Venturi has not presented evidence that Alliance induced the Former Employees to solicit Venturi customers, or that Alliance has solicited Venturi customers in violation of the Subcontractor Agreements. Therefore, Venturi has shown a likelihood of success on the merits of this claim against the Former Employees, but not against Alliance.

d.    Computer Fraud & Abuse Act – Defendants Carroll and Kazlauskas

Under 18 U.S.C. § 1030(a)(2)(C), anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer" can be punished by fine or imprisonment. Civil actions under the Computer Fraud & Abuse Act ("CFAA") may be brought by "[a]ny person who suffers damage or loss by reason of a violation of this section," and a party may recover "compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). When an employer has rescinded permission to access a computer and a former employee continues to use that computer, the former employee is using the computer without authorization. *United States v. Nosal*, 844 F.3d 1024, 1034 (9th Cir. 2016).

Venturi alleges that Carroll violated the CFAA under 18 U.S.C. § 1030(a)(2)(C) by

intentionally accessing Venturi's computers and transferring the spreadsheets to his personal email account and continuing to access those files after he resigned from Venturi. Venturi alleges that Kazlauskas violated the CFAA under 18 U.S.C. § 1030(a)(5)(C) by intentionally accessing Venturi's protected computer without authorization to destroy the data stored on the computer. Venturi alleges that these violations caused Venturi damages and/or loss aggregating to at least $5,000 in value over a one-year period.

Alliance argues that this claim is moot because Carroll is already in the process of returning the spreadsheets. Venturi has provided adequate evidence that Carroll accessed the spreadsheets after he was no longer a Venturi employee. Although Carroll was not utilizing a Venturi computer, he did access materials that belonged to Venturi that he was no longer authorized to access. Further, Venturi has provided adequate evidence that Kazlauskas violated 18 U.S.C. § 1030(a)(5)(C) by intentionally accessing a protected computer without authorization and, as a result, caused damage and loss. Venturi has demonstrated a likelihood of success on the merits of this claim.

e.    Oregon Uniform Trade Secrets Act & Defend Trade Secrets Act – Defendant Carroll

Both the Oregon Uniform Trade Secrets Act ("OUTSA") and the Defend Trade Secrets Act ("DTSA") permit a court to grant injunctive relief to prevent "actual or threatened misappropriation" of proprietary trade secrets. 18 U.S.C. § 1836(b)(3)(A)(i); Or. Rev. Stat. § 646.463(1). A violation under either statute is shown if (1) the information was in fact a trade secret, (2) plaintiff took reasonable measures to maintain the secrecy of the information, and (3) defendant's conduct constitutes misappropriation. *Univ. Acct. Serv., LLC v. Schulton*, No. 3:18-cv-01486-SI, 2019 WL 2425122, at *5 (D. Or. June 10, 2019).

The DTSA defines trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information." 18 U.S.C. § 1839(3). The OUTSA defines a trade secret as any information such as "cost data, customer lists, formula, pattern, compilation, program, device, method, technique or process" that derives actual or potential independent economic value from not being generally known to the public. Or. Rev. Stat. § 646.461(4). Under both statutes, misappropriation includes the disclosure, use, or acquisition "of a trade secret of another by a person who knows or has reason to know

that the trade secret was acquired by improper means." 18 U.S.C. § 1839; Or. Rev. Stat. § 646.461(2).

Venturi argues that it is seeking to protect cost data, customer lists, and strategic information that is listed in the spreadsheets that Carroll accessed while working for Alliance. Venturi alleges that it took reasonable measures to protect its trade secrets by requiring its employees and subcontractors to enter into confidentiality agreements. Further, Venturi alleges that Carroll misappropriated Venturi's confidential information by transferring control of the spreadsheets to his personal email account without authorization and by accessing the documents to use and disclose the information after his resignation from Venturi. Alliance argues that Venturi is essentially making an inevitable disclosure claim, which is not recognized under Oregon law or the DTSA. Alliance further argues that Venturi cannot show that it took reasonable measures to protect the spreadsheets because multiple people had access to them, and Carroll has been unable to transfer the spreadsheets to Venturi due to technical difficulties. Finally, Alliance also argues that the information in the spreadsheets is not protectible information, and that, regardless of whether the information is protectible, Carroll has not used the spreadsheets during his employment with Alliance.

Venturi has provided adequate evidence that the information contained in the spreadsheets includes trade secrets under OUTSA and DTSA. Further, Venturi has presented adequate information at this stage to support a claim that Carroll misappropriated Venturi's trade secrets by acquiring the spreadsheets through improper means. Therefore, Venturi has demonstrated a likelihood of success on the merits of these claims against Carroll.

f.    Breach of Fiduciary Duty – Former Employees

Finally, Venturi brings a breach of fiduciary duty claim against the Former Employees, arguing that they each breached their fiduciary duty of loyalty. To recover on a breach of fiduciary duty claim, the plaintiff must prove (1) the existence of a fiduciary relationship between the parties; (2) a breach of one or more of the fiduciary duties arising out of that relationship, and (3) damage to plaintiff resulting from a breach of one or more of those duties. *Element Materials Tech. Food Us LLC v. Kahl*, No. 3:19-cv-01491-SI, 2020 WL 798156, at *4 (D. Or. Feb. 18, 2020). An employee owes a duty of loyalty to their

employer. *Synectic Ventures I, LLC v. EVI Corp.*, 353 Or. 62, 72, 294 P.3d 478 (2012). However, that duty exists only so long as the employee remains employed by the company. *Konecranes, Inc. v. Scott Sinclair*, 340 F. Supp. 2d 1126, 1132 (D. Or. 2004). The duty of loyalty includes a "duty not to divulge the confidential information or trade secrets of his employer for his own benefit or for the benefit of third parties." *Alexander & Alexander Benefits Servs., Inc. v. Benefit Brokers & Consultants, Inc.*, 756 F. Supp. 1408, 1414 (D. Or. 1991); *see McCombs v. McClelland*, 223 Or. 475, 483-84, 354 P.2d 311 (1960).

Venturi argues that each of the Former Employees breached their fiduciary duty of loyalty to Venturi by misappropriating Venturi's protected confidential information and trade secrets for Alliance's benefit, by acting for a direct competitor while employed at Venturi, by failing to perform their job duties while employed by Venturi to benefit a competitor, by soliciting Venturi customers for Alliance while still employed by Venturi, and by soliciting other Venturi employees to terminate their employment with Venturi and to take employment with Alliance. Plaintiff has provided sufficient evidence that each Former Employee breached their fiduciary duty of loyalty to Venturi while employed by Venturi. Specifically, Venturi provided evidence that (1) Kazlauskas solicited Venturi customers, misappropriated Venturi's confidential and proprietary information, and encouraged other Venturi employees to resign and accept employment at Alliance; (2) Carroll misappropriated Venturi's confidential and proprietary information; and (3) Johnson solicited Venturi customers for Alliance while employed by Venturi. Venturi has demonstrated a likelihood of success on the merits of this claim.

In sum, Venturi has demonstrated a likelihood of success on the following claims: (1) breach of contract against the Former Employees; (2) tortious interference with contractual relations and prospective business advantage against the Former Employees; (3) violation of the CFAA by Carroll and Kazlauskas; (4) violation of OUTSA and DTSA by Carroll; and (5) breach of fiduciary duty by the Former Employees.

2.    *Irreparable Harm*

A plaintiff must show, at the very least, that "irreparable harm is *likely*, not just possible."

19

*All. For The Wild Rockies*, 632 F.3d at 1131.  Speculative injury is insufficient.  *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984).  However, "[w]here a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm."  *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 517 (9th Cir. 1993).  Intangible injuries, such as loss of goodwill and prospective customers, can qualify as irreparable harm.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

As discussed, Venutri has demonstrated a strong chance of success on the merits of five of its seven claims.  Therefore, it need only show the possibility of irreparable harm.  Venturi has shown a possibility of irreparable harm regarding the use of Venturi's confidential and proprietary information. Carroll still has access to the spreadsheets, which contain proprietary information about customers, ongoing projects, pricing, etc.  Use of that information would cause damage to Venturi, and Venturi has presented evidence that it has already lost income.  Although Alliance argues that economic injury alone does not support a finding of irreparable harm, *Rent-a-Center, Inc. v Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), Venturi has also shown a likelihood of irreparable harm through the loss of goodwill from the Former Employees alleged violations of their Confidentiality Agreements.  Venturi has alleged that solicitation of current Venturi employees appears to have caused a mass resignation, which has impacted ongoing projects and led to discontent among current Venturi customers, thereby injuring Venturi's goodwill with existing and prospective customers.  Venturi has sufficiently shown a likelihood of irreparable harm.

       3.     *Balance of Equities and Public Interest*

Venturi argues that public policy supports the protection of trade secrets and does not weigh against enforcing non-solicitation and non-compete provisions.  *See, e.g.*, *Brinton Bus. Ventures, Inc. v. Searle*, 248 F. Supp. 3d 1029, 1039-40 (D. Or. 2017).  Alliance argues that injunctive relief would cause Alliance economic harm by preventing it from working with clients with whom they have already been doing business.  Further, Alliance argues that the Former Employees would be harmed by injunctive relief because they would be prevented from working in their current roles.  Finally, Alliance argues that

the public interest would be harmed because customers would be unable to exercise their own independent business judgment.

The balance of equities weighs in Venturi's favor. Venturi has alleged irreparable harm that is likely to occur, and the use of confidential information is not a harm that is easily remedied, if it can be remedied at all. Further, ongoing solicitation of Venturi's current employees by the Former Employees will cause Venturi harm by hindering the progress of its projects and impacting its goodwill with its current customer base. Although injunctive relief may temporarily limit the scope of the Former Employees' roles at Alliance, it should not prevent them from continuing to work in their current roles. If anything, they will be able to continue working in their current roles, merely without the benefit of any of Venturi's proprietary information.

Because Venturi has not demonstrated a likelihood of success on any of its claims against Alliance, any injunctive relief cannot be directed at Alliance. Therefore, Alliance's argument that injunctive relief will harm it economically by hindering its relationships with its customers will not be realized through injunctive relief.

4.    *Security*

Because Venturi has demonstrated a likelihood of success on the merits on its claims against the Former Employees, that Venturi is likely to suffer irreparable harm, and that the balance of equities and the public interest weigh in Venturi's favor, a TRO will issue. The sole remaining issue is security. Venturi asks that security be waived or be no greater than $5,000. Alliance argues that security should be "significant" to protect Alliance from the harm that will be caused to its business from a TRO. Because the scope of the TRO is unlikely to impact Alliance's business opportunities or the Former Employees' job opportunities, security is waived.

**CONCLUSION**

Plaintiff's Motion for Temporary Restraining Order, ECF [2], is GRANTED. The Court ORDERS the following:

1.    Defendants Carroll, Kazlauskas, and Johnson must refrain from all actions in violation of,

or that would interfere with, Venturi's confidentiality rights under the Confidentiality Agreement, including but not limited to disclosing, misusing, or misappropriating for defendants' use or the use of others any confidential or proprietary information or trade secrets of Venturi;

2.      Defendants Carroll, Kazlauskas, and Johnson must return to Venturi's counsel all property, documents, files, reports, work product, and/or other materials, that they have in their possession, custody, or control that were obtained directly or indirectly from Venturi or that constitute work product owned by Venturi;

3.      Defendants Carroll, Johnson, and Kazlauskas are temporarily enjoined from soliciting Venturi's employees;

4.      Defendants Carroll, Johnson, and Kazlauskas are temporarily enjoined from soliciting or transacting business with Venturi's customers with whom they worked, or learned confidential information about, while at Venturi; and

5.      Defendant Kazlauskas is temporarily enjoined from assisting Alliance in the development of sales strategies, best practices, support, marketing, or solicitation concerning owners or managers of multi-family properties and commercial rental properties, such as property management companies.

This TRO shall become effective immediately. Good cause, justice, and equity support waiving any bond requirement for plaintiff. This TRO shall continue until August 18, 2023. Defendants Carroll, Johnson, and Kazlauskas are ordered to appear for a hearing on August 16, 2023, from 1:00-2:00 P.M. in Portland Courtroom 14A before Judge Adrienne Nelson to show cause why a preliminary injunction should not be issued.

IT IS SO ORDERED.

DATED this 3rd day of August, 2023.

Adrienne Nelson
United States District Judge

22