IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ISOSCELES HOLDINGS, LLC, d/b/a VENTURI RESTORATION, and VENTURI NATIONAL SERVICES LLC, | Case No.: 3:23-cv-01004-AN |
| Plaintiffs,<br>v. | OPINION AND ORDER |
| ALLIANCE ENVIRONMENTAL GROUP LLC, THERMATECH NORTHWEST INC., BRANDYN CARROLL, OLIVIA JOHNSON, and NATHAN KAZLAUSKAS, | |
| Defendants. | |

On August 3, 2023, this Court granted in part, and denied in part, plaintiffs Isosceles Holdings, LLC, d/b/a Venturi Restoration and Venturi National Services LLC's (collectively, "Venturi") Motion for Temporary Restraining Order. On August 23, 2023, Venturi filed this Motion for Preliminary Injunction, ECF [43]. Oral arguments were held on September 12, 2023, with all parties present. For the reasons outlined below, Venturi's Motion for Preliminary Injunction is GRANTED.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Generally, a plaintiff seeking a preliminary injunction must show: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest. *Id.* at 20.

The Ninth Circuit also employs a "serious questions" test which dictates that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. For The*

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Thus, under the serious questions test, a preliminary injunction can be granted if there is a likelihood of irreparable injury to the plaintiff, serious questions going to the merits, the balance of hardships tips in favor of the plaintiff, and the injunction is in the public interest. *M. R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## BACKGROUND

Much of the factual background of this case is outlined in this Court's August 3, 2023, opinion and order granting in part, and denying in part, Venturi's Motion for Temporary Restraining Order. For purposes of the present motion, only newly alleged facts are provided. Because the temporary restraining order was entered solely against the Former Employees, only newly alleged facts pertaining to them are discussed.

### A.    Former Employees' Factual Background

When Kazlauskas was hired, he received his offer letter informing him that he needed to sign the Confidentiality Agreement five days before his first scheduled day of work for Venturi. Second Decl. of Nathan Kazlauskas ("2d Kazlauskas Decl."), ECF [58], Ex. A. Kazlauskas electronically signed those documents, along with other onboarding documents, on August 4, 2021. *Id.* ¶ 4, Ex. C. He began working for Venturi on August 9, 2021. *Id.* ¶ 3. Many of the allegations against Kazlauskas pertain to a large Venturi customer, Customer D. Kazlauskas alleges that he has known someone working for Customer D since 1998. Decl. of Nathan Kazlauskas ("Kazlauskas Decl."), ECF [23], ¶ 3. In July 2015, Kazlauskas joined ATI Restoration after his contact at Customer D recommended him to ATI Restoration's Vice President of Operation. *Id.* ¶ 5. Kazlauskas' contact at Customer D had allegedly indicated that if ATI hired Kazlauskas, Customer D would utilize ATI's services for all of its forty to fifty properties in the Pacific Northwest. *Id.* When Kazlauskas joined Venturi in 2021, Customer D, began using Venturi's services in lieu of ATI's services. *Id.* ¶ 6. Kazlauskas alleges that, prior to him joining Venturi, Venturi had not performed restoration work for Customer D. 2d Kazlauskas Decl. ¶ 7. Although

ATI had sent Kazlauskas a cease-and-desist letter in attempt to prevent him from soliciting Customer D while at Venturi, it did not pursue any additional relief.  *Id.* ¶ 6, Ex. D.

While Kazlauskas was at Venturi, he alleges that Customer D used Venturi as its primary restoration contractor and used ATI as its secondary contractor.  *Id.* ¶ 8.  Kazlauskas alleges that Customer D's standard business practice "was to have multiple contractors available to bid on projects." *Id.*  Thus, Kazlauskas alleges that he expected Customer D to find another restoration contractor when ATI acquired Venturi.  *Id.* ¶ 9.  Kazlauskas does not deny that Customer D contacted him when he joined Alliance to see if Alliance would provide restoration services for Customer D.  *Id.*

Carroll also received his offer letter from Venturi with the Confidentiality Agreement five days before he began working for Venturi.  Second Decl. of Brandyn Carroll ("2d Carroll Decl."), ECF [56], ¶¶ 2-3, Ex. A.  As part of his role at Venturi, Carroll created a system of spreadsheets using Google Sheets that Venturi's Portland office utilized to keep track of the work that it performed each day. *Id.* ¶¶ 7-8.  The spreadsheets allowed Carroll to update customers on the progress of his team's work, but any information on completed jobs was not removed from the spreadsheets.  *Id.*  The template was also shared, and used, at Venturi's Seattle, Washington office and Venturi's Phoenix, Arizona office.  *Id.* ¶ 9. Carroll transferred control of the spreadsheets to his personal email address before leaving Venturi.  Decl. of Derek Middleton ("Middleton Decl."), ECF [5], ¶ 27.   Carroll alleges that he has not attempted to access the spreadsheets since June 26, 2023, except to attempt to transfer ownership of the spreadsheets to Venturi.  Decl. of Brandyn Carroll ("Carroll Decl."), ECF [25], ¶¶ 3-8.  That transfer has since been completed and Carroll no longer has access to the spreadsheets through his personal email address.  2d Carroll Decl. ¶¶ 15-16.

Johnson began working at Venturi as an estimator on March 21, 2022.  Decl. of Olivia Johnson ("Johnson Decl."), ECF [57], ¶¶ 2-3.  Johnson received her offer letter from Venturi on February 16, 2022.  *Id.* Ex. A.  She signed the Confidentiality Agreement on February 23, 2022.  *Id.* Ex. B.  The scope of Johnson's work included project assignments where she traveled to damaged residences or properties, assessed the damage and necessary remediation, and created an estimate for the project.  *Id.*

¶ 5.  Johnson asserts that her job did not involve customer solicitation.  *Id.*  She resigned from Venturi on June 6, 2023 and began working at Alliance.  *Id.* ¶¶ 6-7.  Her job position at Alliance is "Operations Manager," and her duties include supervising office staff and managing restoration and repair crews.  *Id.* ¶ 8.

**B.  Alleged Incidents of Misconduct**

On May 25, 2023, while still employed at Venturi, Johnson, Carroll, and Kazlauskas allegedly used their Venturi email accounts to divert a new project for a Venturi customer to Alliance. Middleton Decl. ¶ 31, Ex. L.  The project originally began in November 2022 when a downed tree had demolished a portion of Customer A's home.  Fourth Decl. of Caleb Parrotte ("4th Parrotte Decl."), ECF [61], ¶ 3.  Initially, Venturi tarped the residence as a stop-gap measure and Johnson drafted an estimate for the customer in December 2022 that included extensive demolition and mitigation.  *Id.* ¶ 3, Ex. A. Payment for the tarping stalled, thus Venturi ceased work on the project.  *Id.* Ex. B.  The job was closed in March 2023 when the tarping invoice was paid.  *Id.* ¶ 3.

The customer reached out to Venturi in April 2023 and was directed to Carroll.  *Id.* ¶ 4. Carroll assembled a team that included Johnson and Kazlauskas.  *Id.*  Additionally, Carroll brought in Alliance as a subcontractor to perform the demolition portion of the project.  *Id.* ¶ 4, Exs. C, D.  However, Venturi alleges that they have no record of the project in their systems.  *Id.* ¶ 5.  Thus, Venturi alleges that the Former Employees failed to enter any information related to Customer A's project, or the Alliance subcontracting work, in Venturi's systems.  *Id.* ¶ 6; Middleton Decl., Ex. M.  The Former Employees deny diverting the project to Alliance, and Alliance asserts that it performed work on the project as a subcontractor.  2d Kazlauskas Decl. ¶ 14; 2d Carroll Decl. ¶ 17; Johnson Decl. ¶ 11; Third Decl. of Nathan Kazlauskas ("3d Kazlauskas Decl."), ECF [69], ¶ 6, Ex. B; Decl. of Kelly Kambs ("Kambs Decl."), ECF [24], ¶ 4.

On June 30, 2023, a Venturi customer, Customer B, mistakenly emailed Kazlauskas and a former Venturi employee, who is not a party to this case, at their Venturi email addresses to discuss a bid from Alliance and the former employees.  Middleton Decl. ¶ 33, Ex. O.

On July 17, 2023, a current Venturi employee allegedly witnessed Kazlauskas and several other former Venturi employees soliciting a Venturi customer, Customer C, that Alliance had previously worked for as a Venturi subcontractor and that the Former Employees previously serviced while employed by Venturi.  Decl. of Tielor Cronin ("Cronin Decl."), ECF [35], ¶¶ 2-3.  The former Venturi employees, including Kazlauskas, were allegedly visiting multiple apartment units at the property.  *Id.*  A property manager at the job site confirmed to the Venturi employee that Customer C had engaged Alliance to do work on the property.  *Id.*  Kazlauskas denies being at Customer C's job site, stating that he "was on business in California" on July 17, 2023.  2d Kazlauskas Decl. ¶ 13.

In July 2023, Customer D informed Venturi that it would no longer be Customer D's primary service provider and would instead be its second-choice provider.  Decl. of Barry Metcalf, ECF [36], ¶ 9.  Kazlauskas denies initiating any communication with Customer D but acknowledges that he received separate phone calls from two of Customer D's employees after he left Venturi.  2d Kazlauskas Decl. ¶ 14; Kazlauskas Decl. ¶ 7.

On August 9, 2023, Venturi was called to one of Customer D's properties to assess water damage to two units on the property.  Second Decl. of Tielor Cronin ("2d Cronin Decl."), ECF [46], ¶ 2.  Alliance had allegedly already performed work on the units related to the water damage.  *Id.*

On August 16, 2023, Customer D asked Venturi to provide a bid in competition with a bid from Alliance.  Third Decl. of Caleb Parrotte ("3d Parrotte Decl."), ECF [44], ¶ 3.  Kazlauskas and another former Venturi employee, who is not a party to this case, were listed as the primary contact on the Alliance bid.  *Id.*  Kazlauskas alleges that, though Customer D contacted him on July 27, 2023 about the project, he connected Customer D with a fellow Alliance colleague and had no further involvement.  2d Kazlauskas Decl. ¶ 14.  Evidence on the record indicates that Kazlauskas was included in email communications with Customer D through August 9, 2023.  3d Parrotte Decl., Ex. A.

As already stated, on August 3, 2023, this Court entered a Temporary Restraining Order against the Former Employees with the following restrictions:

5

1. Defendants Carroll, Kazlauskas, and Johnson must refrain from all actions in violation of, or that would interfere with, Venturi's confidentiality rights under the Confidentiality Agreement, including but not limited to disclosing, misusing, or misappropriating for defendants' use or the use of others any confidential or proprietary information or trade secrets of Venturi;

2. Defendants Carroll, Kazlauskas, and Johnson must return to Venturi's counsel all property, documents, files, reports, work product, and/or other materials, that they have in their possession, custody, or control that were obtained directly or indirectly from Venturi or that constitute work product owned by Venturi;

3. Defendants Carroll, Johnson, and Kazlauskas are temporarily enjoined from soliciting Venturi's employees;

4. Defendants Carroll, Johnson, and Kazlauskas are temporarily enjoined from soliciting or transacting business with Venturi's customers with whom they worked, or learned confidential information about, while at Venturi; and

5. Defendant Kazlauskas is temporarily enjoined from assisting Alliance in the development of sales strategies, best practices, support, marketing, or solicitation concerning owners or managers of multi-family properties and commercial rental properties, such as property management companies.

Op. & Order, ECF [37], at 21-22. Venturi now seeks a preliminary injunction, to remain in place during this litigation, with the same restrictions.

## DISCUSSION

### A.    Likelihood of Success on the Merits

In this Court's August 3rd Opinion and Order, it determined that Venturi had demonstrated a likelihood of success on the merits of (1) its breach of contract claim against the Former Employees; (2) its tortious interference with contractual relations claim against Kazlauskas and its prospective business advantage claims against the Former Employees; (3) its Computer Fraud & Abuse

Act ("CFAA"), 18 U.S.C. § 1030, claims against Carroll and Kazlauskas; (4) its Oregon Uniform Trade

Secrets Act ("OUTSA"), Oregon Revised Statute ("ORS") § 646.463, and Defend Trade Secrets Act

("DTSA"), 18 U.S.C. § 1836, claims against Carroll; and (5) its breach of fiduciary duty claims against

the Former Employees.  Thus, the question before this Court is whether, in light of the additional

evidence and arguments presented, Venturi has still demonstrated a likelihood of success on the merits of

these claims.

       1.    *Breach of Contract*

       Venturi bases its breach of contract claim against the Former Employees on the

Confidentiality Agreements they each signed as a condition of their employment with Venturi.  Sections

1.1 and 1.2 of the Confidentiality Agreements state:

> "During and after Employee's employment with the Company, Employee will protect and
> hold in strictest confidence all Confidential Information of the Company, its clients and
> business relations.  Confidential information may be of a technical or business nature and
> includes, without limitation, trade secrets, plans and prospects for new or modified
> services, service know-how and implementation, innovation, programs, reports, studies,
> methods, customer and supplier lists, customer service requirements, customer projects,
> any information provided by a customer or business relation, costs of providing services,
> operating costs, pricing structures, bids, business prospects and plans, training programs
> and manuals, marketing or business plans, bidding techniques, and sales and marketing
> materials and strategies.
> . . . .
> "The Employee shall preserve in confidence and shall not disclose, use, share, copy,
> publish, summarize or remove, either during or after the term of Employee's employment,
> any confidential information, except as required in Employee's work for the Company or
> as authorized in writing by the Company in each instance.  Upon termination of the
> Employee's employment with the Company, or upon request of the Company at any time,
> the Employee shall deliver to the Company all forms of materials in Employee's
> possession or control that contain or embody any Confidential Information and shall
> purge or otherwise destroy all Confidential Information not capable of being returned."

First Am. Compl., ECF [41], Ex. A, at 1.  The Confidentiality Agreements also contain a noncompetition

clause and a non-solicitation clause as set forth by Sections 2.1 and 2.2 respectively:

> "Employee agrees that during Employee's employment by Company and for
> twelve (12) months after termination of such employment for any reason . . . , Employee
> will not in any capacity . . . directly or indirectly, whether or not for compensation,
> engage in or assist others to engage in any business that is, or is preparing to be, in
> competition with any product, process or service that was developed, distributed or
> offered by Company up to the time of Employee's termination of employment[.] . . .

"Employee further agrees that during the Noncompete period, Employee will not call on, reveal the name of, or otherwise solicit, accept business from or attempt to entice away from the company any actual or identified potential customer of Company, nor will Employee assist others in doing so. Employee further agrees that Employee will not, during the Noncompete Period, encourage or solicit or assist others to encourage or solicit any other employee or consultant of Company to leave such employment for any reason."

*Id.* Ex. A, at 2. Venturi alleges that Carroll violated Sections 1.2 and 2.2, Johnson violated Section 2.2, and Kazlauskas violated Sections 1.2, 2.1, and 2.2. Venturi further argues that Oregon law applies to the interpretation of the Confidentiality Agreement as applied to each of the Former Employees.

As for Sections 1.1 and 1.2, defendants argue that any claims related to these sections are moot because Venturi has provided no evidence that the Former Employees disclosed confidential information during their employment at Alliance, and any physical confidential information, namely, the spreadsheets, has now been returned to Venturi. However, defendants also state that they are willing to "stipulate to the entry of a limited injunction solely relating to confidential or proprietary information." Defs.' Resp. in Opp. to Mot. for Prelim. Inj. ("Defs.' Resp."), ECF [55], at 8. The Court declines to address defendants' mootness argument given their concession to the entry of injunctive relief related to confidential and proprietary information.

a.    Section 2.1

Venturi alleges a Section 2.1 violation only against Kazlauskas. However, Kazlauskas argues that, under applicable Oregon law, Section 2.1, the noncompetition clause, is void and unenforceable against him. It is undisputed that Kazlauskas entered into the Confidentiality Agreement on August 4, 2021—thus, the 2019 version of ORS § 653.295 applies to his agreement. However, Venturi argues that Missouri law applies to Section 2.1 of Kazlauskas' Confidentiality Agreement because he was a Missouri resident for most of his tenure at Venturi.

In oral argument for Venturi's Motion for Temporary Restraining Order, Alliance had argued that Section 2.2, the non-solicitation provision, was governed by Washington law because Kazlauskas was originally hired to work in Venturi's Seattle, Washington office. However, in the Court's prior opinion, it held that there was no material difference between Washington law and Oregon law

regarding Section 2.2.  Though Venturi and the Former Employees maintain that Section 2.2 of the Confidentiality Agreement is governed by Oregon law, Venturi's new argument is that Section 2.1 of the Kazlauskas' Confidentiality Agreement is governed by Missouri law.

Thus, the Court must again address a choice-of-law argument: whether Oregon or Missouri law applies to Section 2.1 of Kazlauskas' Confidentiality Agreement.  "When sitting in diversity, [federal courts] apply the choice-of-law rules of the forum state."  *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1161 (9th Cir. 2012).  Although ORS § 15.360 governs choice of law issues in contracts when no choice of law has been made by the parties, the threshold inquiry is whether there is a material difference between Oregon law and the law of the other forum.  *Portfolio Recovery Assocs., LLC v. Sanders*, 366 Or. 355, 365, 462 P.3d 263 (2020) ("ORS 15.360 does not supply a mechanism for Oregon Courts to choose the law of another state when there is no apparent conflict with the applicable Oregon law.").  Where no material difference exists, Oregon courts apply Oregon law without regard to the relative significance of the relationship between the dispute and the proposed alternative forum.  *Id.*  It is the burden of the party advocating the application of a different jurisdiction's law to identify material differences between that jurisdiction's law and Oregon's, and Oregon courts will apply Oregon law if no party identifies any material distinctions, without regard to whether such distinctions in fact exist.  *Angelini v. Delaney*, 156 Or. App. 293, 300, 966 P.2d 223 (1998).

Venturi's briefing does not clearly identify a material difference between Oregon law and Missouri law, as relevant to the noncompetition clause, though it does argue that Missouri law applies to Section 2.1 of Kazlauskas' Confidentiality Agreement.  However, at oral argument, Venturi contended that there was a material difference between Oregon law and Missouri law because, under Oregon law, the noncompetition provision would be voidable unless Venturi met five requirements.  *See* Or. Rev. Stat. § 653.295(1) ("A noncompetition agreement entered into between an employer and employee is voidable and may not be enforced by a court of this state unless" five conditions are met).  Conversely, Missouri has no statutes addressing noncompetition provisions in contracts between employers and employees. *See, e.g.*, Mo. Stat. § 431.202 (addressing limitations on non-solicitation provisions in employment

contracts); *see also MFA Oil Co. v. Martin*, 597 S.W.3d 351, 357 (Mo. 2020) (declining to apply Mo. Stat. § 431.202 to traditional noncompetition clause). Rather, noncompetition clauses are subject to Missouri common law principles. In Missouri, a noncompetition clause will be enforced if "it is reasonable, meaning 'it is no more restrictive than is necessary to protect the legitimate interest of the employer.'" *JumboSack Corp v. Buyck*, 407 S.W.3d 51, 55 (Mo. Ct. App. 2013) (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. 2006) (en banc)). Thus, a noncompetition clause "must be narrowly tailored geographically and temporally." *Id.* Missouri common law does not appear to contain employer requirements that would render a noncompetition agreement voidable if not met.

Upon review of the relevant laws, there is a material difference between Oregon's and Missouri's laws on the enforceability of noncompetition covenants. Because the Confidentiality Agreement contains no choice-of-law provision, the Court must apply the three-prong test outlined in ORS § 15.360 to determine which forum's law should apply. First, the Court must "[i]dentify[ ] the states that have a relevant connection with the transaction or the parties, such as the place of negotiation, making, performance or subject matter of the contract, or the domicile, habitual residence or pertinent place of business of a party." Or. Rev. Stat. § 15.360(1). Second, the Court must "[i]dentify[ ] the policies underlying any apparently conflicting laws of these states that are relevant to the issue." *Id.* § 15.360(2). Third, the Court must "[e]valuate[ ] the relative strength and pertinence of these policies in: (a) [m]eeting the needs and giving effect to the policies of the interstate and international systems; and (b) [f]acilitating the planning of transactions, protecting a party from undue imposition by another party, giving effect to justified expectations of the parties concerning which state's law applies to the issue and minimizing adverse effects on strong legal policies of other states." *Id.* § 15.360(3)(a)-(b).

The relevant states have already been identified as Oregon and Missouri. The next step is identifying the policies underlying these states' laws on noncompetition agreements. In Missouri, the policy concerns relevant to noncompetition agreements are "balanc[ing] the competing concerns between an employer and employee in the workforce." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo.

2012). That is, "employees have a legitimate interest in engaging a highly trained workforce without the risk of losing customers and business secrets after an employee leaves his or her employment," but "employees have a legitimate interest in having mobility between employers to provide for their families and advance their careers." *Id.* In Oregon, the 2019 version of ORS 653.295 was aimed at "address[ing] the perceived overuse of noncompetition agreements for lower-level employees and to ensure that such agreements would restrict only employees who had access to trade secrets or other confidential, sensitive information belonging to the employer." *Bernard v. S.B., Inc.*, 270 Or. App. 710, 718-19, 350 P.3d 460 (2015) (citing Staff Measure Summary, H. Comm. on Elections, Ethics & Rules, 2007 Leg., 74th Sess. (Or. 2007)).

There is little caselaw available on the application of ORS § 15.360's third prong. Though similar in some respects, Oregon's policies appear to be aimed at providing greater protection to employees, whereas Missouri's policies are aimed at striking a balance between employer and employee rights. Although Oregon seems to have a stronger legal policy for employees, ORS § 15.360(3)(b) focuses on "minimizing adverse effects on strong legal policies of *other* states," not minimizing adverse effects to *Oregon*'s strong legal policies. However, the language of the statute implies that Oregon law should be applied, as it states that a noncompetition agreement "may not be enforced by a court of this state unless" the five requirements are met. Or. Rev. Stat. § 653.295(1). The issue is whether this language supersedes the choice of law statute, ORS § 15.360. That is, the question is whether, in including that language in ORS § 653.295(1), the Oregon legislature intended for Oregon law to always apply to noncompetition agreements, even if choice of law principles dictated that another state's laws should apply. It seems unlikely that the Oregon legislature would impose such a requirement without clearly stating an intent to do so, and defendants have provided no evidence to the contrary.

Continuing through the ORS § 15.360 factors, defense counsel noted at oral argument that Kazlauskas had no reason to believe that Oregon law would apply to his Confidentiality Agreement when he entered into it, nor did he have such an expectation during the course of his employment. Thus, he likely did not have a justified expectation that Oregon law would apply to the Confidentiality

Agreement or that he would be entitled to the greater protection afforded by Oregon noncompetition law. If anything, he had a more justifiable expectation that Missouri law would apply to the Confidentiality Agreement given that he was domiciled in Missouri for over half of the time that he was employed by Venturi. On the other hand, Oregon law could protect Kazlauskas from "undue imposition by another party" by affording greater protection against Venturi's invocation of the noncompetition provision of the Agreement. However, this depends largely on whether that invocation could be considered "undue."

On balance, the Court finds that Missouri law is the appropriate law for evaluating Section 2.1 of Kazlauskas' Confidentiality Agreement. Missouri law is more likely what Kazlauskas and Venturi would have expected to govern his Confidentiality Agreement. Though Kazlauskas performed work in Oregon, he also performed work in a number of other states in the course of his work for Venturi, and allegedly spent only two to five days in Oregon each month. Further, although Kazlauskas entered into the Confidentiality Agreement while in Washington, he resided in Missouri for the majority of his tenure with Venturi, and he admittedly had no reason to expect that Oregon law would apply to his Confidentiality Agreement. It seems counterintuitive that Kazlauskas should receive the benefit of Oregon's laws, despite never having a reason to expect that benefit, when his strongest connection to Oregon is the present lawsuit.

Having determined that Missouri law applies to the noncompetition provision of Kazlauskas' Confidentiality Agreement, the next issue is whether, under Missouri law, that provision is enforceable. Under Missouri law, a noncompetition agreement is enforceable "if it is demonstratively reasonable." *Whelan*, 379 S.W.3d at 841. A reasonable noncompetition agreement "is no more restrictive than is necessary to protect the legitimate interests of the employer," "must be narrowly tailored temporally and geographically," and is enforceable "only to the extent that the restrictions protect the employer's trade secrets or customer contacts." *Id.* at 841-42 (quoting *Copeland*, 198 S.W.3d at 609-10).

Kazlauskas' noncompetition provision prohibits him, for a period of twelve months, from engaging in, or assisting others, in any business that is in competition with any product, process, or service offered by Venturi up to the time of his employment. The provision defines a competing business

as an "entity [that] is engaged in the business of residential and/or commercial reconstruction, restoration, renovation and disaster and emergency mitigation services" that is located within 50 miles of the territory that Kazlauskas worked on behalf of Venturi. First Am. Compl., Ex. A, at 2. Put simply, Kazlauskas would be prohibited for twelve months from working for any company, engaged in the same business as Venturi, that is located within fifty miles of the areas in Oregon, Washington, Arizona, and California that Kazlauskas worked while employed by Venturi.

*Whelan* is instructive on this issue. In that case, the employer, a nationwide corporation that provided security guard services, sued two former employees for violating the terms of their employment contracts, seeking injunctive relief and damages. 379 S.W.3d at 839. One of the former employees had been hired as the "director of quality assurance" and his duties included "managing the operations, clients, and customers of the [Dallas, Texas] office." *Id.* That employee's employment contract contained a provision prohibiting him, for a period of two years, from "work[ing] for a competing business within a fifty (50) mile radius of any location where employee ha[d] provided or arranged for employer to provide services." *Id.* at 840. The contract defined a competing business as "any business engaged in providing guard and/or security services the same as, or similar to, those offered by employer." *Id.*

The trial court granted summary judgment in favor of the former employees after concluding that the noncompetition and non-solicitation clauses were invalid as overbroad and unreasonable. *Id.* However, on review, the Missouri Supreme Court reversed, holding that the noncompetition clause was enforceable against the former employee, noting that "[c]onsiderable precedent in Missouri supports the reasonableness of a two-year noncompetition agreement for an operations manager that is limited to 50 miles from where services were rendered by the employee." *Id.* at 846-47.

At first glance, Kazlauskas' noncompetition clause is nearly identical to that of the former employee in *Whelan*. Like the former employee, Kazlauskas is prohibited, for twelve months from his resignation date, from working for a competing business located within fifty miles of any area where he

provided services for Venturi.  The duration of Kazlauskas' noncompetition agreement is actually a full year shorter than that of the former employee in *Whelan*.  Where the two cases diverge, however, is in the practical effect of enforcing the noncompetition agreement.  In *Whelan*, the former employee was based out of a single office in Dallas, Texas, and though there was a dispute as to whether he provided services in Houston, Texas, there is little indication that his work spanned multiple states.  Conversely, Kazlauskas' work for Venturi spanned four separate states, meaning enforcing the noncompetition clause against him would generate a much larger prohibitory radius than that described in *Whelan*.

In considering the reasonableness of a noncompetition provision, the Court must consider the particular circumstances of the case, "including the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business." *R.E. Harrington, Inc. v. Frick*, 428 S.W.2d 945, 950 (Mo. App. 1968).  In one case, the Missouri Court of Appeals found that a noncompetition clause that prohibited the former employee from working for any competing business located within fifty miles of any of the employer's businesses would "greatly limit[ ] [the former employee] in the geographic area she could work." *Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 436 (Mo. App. 2008).  Notably, the business in that case had locations only in Missouri and Arkansas. *Id.*  The potential impact on Kazlauskas from enforcing the noncompetition clause would be far greater than that experienced by the former employee in *Payroll Advance*.

Yet, in *Osage Glass, Inc. v. Donovan*, a former employee was an operations manager for two years and entered into a noncompetition agreement with his employer that prohibited him from working for any competing business in the state of Missouri for a period of three years.  693 S.W.2d 71, 72-73 (Mo. 1985).  The Missouri Supreme Court reversed the trial court's denial of the employer's injunctive relief, holding that the noncompetition provision was enforceable despite its broad terms. *Id.* at 73.  The court emphasized that the former employee had held a position "in which he could cause substantial harm to the plaintiff by going to work for a competitor." *Id.* at 75.  Specifically, the court noted that "[h]e dealt directly with customers on important problems," "he accepted a managerial position," and his employer "had reason to believe that [the former employee] could harm the business by

14

going to work for a competitor and attracting customers to the competitor." *Id.*

Whether the provision is enforceable as written depends primarily on whether the practical geographic scope is necessary to protect Venturi's legitimate interests, beyond preventing mere competition from Kazlauskas. *See Darr v. Roberts Mktg. Group, LLC*, 428 S.W.3d 717, 726 (Mo. App. 2014). Thus, the question becomes whether the geographic scope of the noncompetition provision is necessary to protect Venturi's trade secrets or customer lists. *Id.* There is some evidence that the restriction is necessary to protect Venturi's customer lists. As part of his job as Venturi's Regional Vice President of the West Coast, Kazlauskas traveled "extensively to meet with customers" and "to solicit [ ] customers" on Venturi's behalf. Middleton Decl. ¶¶ 11-12. Further, Kazlauskas' position required him to attend weekly production meetings in the West Coast region where "management would review all of the current jobs Venturi was working on, accounts receivable, and problems with collections[.]" *Id.* ¶ 10. Further, Kazlauskas' primary responsibility at Venturi was "growing and supporting Venturi's business with owners or managers of multi-family properties and commercial rental properties and developing standard operations procedures for these customers." *Id.* ¶ 11. He also had access to Venturi's customer relationship management database, and a customer database that was specific to Venturi's multi-family customers. *Id.* ¶¶ 13-14.

However, there is less evidence that Venturi has a protectible interest in its trade secrets. Notably, Missouri utilizes a unique definition of "trade secret" in the noncompetition context. Specifically, Missouri law defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 18-19 (Mo. 1966) (en banc). Six factors are evaluated when assessing whether certain information is a trade secret:

> "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by the employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Brown v. Rollet Bros Trucking Co.*, 291 S.W.3d 766, 776 (Mo. App. 2009) (internal quotation marks omitted). However, "[m]atters of public knowledge or information that are generally known with a given industry cannot be appropriated as a trade secret," nor does protection extend to "knowledge that is the natural product of the employment or known throughout the industry." *Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767, 774 (Mo. App. 2014).

From Venturi's pleadings and requested injunctive relief, it appears that, aside from customer lists, its primary trade secrets concern is Kazlauskas' development of Venturi's business in multi-family properties and commercial rental properties. However, Venturi's allegations likely do not elevate this information from merely confidential to that of a trade secret. Venturi does not allege that the "standard operating procedures" for these business interactions is not known outside of Venturi's business, that they have taken steps to guard the secrecy of those procedures, or that the procedures could not be easily duplicated by other businesses. Based on Venturi's allegations, Kazlauskas' work in its multi-family property and commercial rental property business cannot be understood as involving information that is not "generally known within a given industry." *See id.* at 767. Thus, Venturi likely does not have a protectible interest in Kazlauskas' knowledge and development of its multi-family property and commercial rental property business.

On balance, the Court finds that, at this stage of the case, the noncompetition provision is likely enforceable to the extent it protects Venturi's protectible interest in its customer lists. Kazlauskas' role at Venturi was more similar to that of the former employee in *Osage* in that he was in a managerial role, had significant interactions with Venturi's customers, and had extensive access to Venturi's customer lists. 693 S.W.2d at 75. Additionally, Venturi likely has a reasonable basis for believing that Kazlauskas could harm its business by working for a competitor and attracting Venturi's customers, especially because it appears this has already happened. *Id.*

Because the noncompetition provision is likely enforceable to protect Venturi's interests in its customer lists, the only remaining question is whether Venturi has provided sufficient evidence to demonstrate a likelihood of success on the merits as to whether Kazlauskas breached Section 2.1. The

Court finds that it has. Alliance's has been described as a "leading environmental, indoor air quality, fire life safety, biohazard, and heat contractor[ ] on the west coast." Decl. of Ryan Pilota, ECF [22], ¶ 3. Further, Alliance has "been performing mitigation, restoration, and reconstruction work in Washington state since September[ ] 2022." *Id.* ¶ 11. It does not appear to be disputed that Alliance was a business competing with the services provided by Venturi at the time of Kazlauskas' resignation. Nor does it appear to be disputed that Kazlauskas' role at Alliance places him within fifty miles of the work he conducted for Venturi. As such, Venturi has demonstrated a likelihood of success on the merits of its breach of contract claim against Kazlauskas based on Section 2.1 of his Confidentiality Agreement.

        b.        Section 2.2

        Section 2.2 of the Agreement, the non-solicitation provision, states that, for a period of twelve months:

> "Employee will not call on, reveal the name of, or otherwise solicit, accept business from or attempt to entice away from the company any actual or identified potential customer of Company, nor will Employee assist others in doing so. Employee further agrees that Employee will not, during the Noncompete Period, encourage or solicit or assist others to encourage or solicit any other employee or consultant of Company to leave such employment for any reason."

First Am. Compl, Ex. A, at 2. Venturi seeks to enforce Section 2.2 of the Agreement against each of the Former Employees. Neither party disputes the Court's earlier finding that Oregon law governs this provision of the Agreement.

        Defendants argue that the non-solicitation clause is overbroad, rendering it, in effect, a noncompetition clause. In this Court's prior Opinion and Order, it addressed this argument and held that Section 2.2 covered the types of actions contemplated by ORS § 653.295(4)(b), the non-solicitation clause exception in Oregon's noncompetition agreement statute.[1] Op. & Order 10. ORS § 653.295(4)(b) exempts covenants "not to solicit employees of the employer or solicit or transact business with customers

---

[1] Johnson signed her Confidentiality Agreement on February 23, 2022, whereas Carroll and Kazlauskas signed their Confidentiality Agreements on September 29, 2021 and August 4, 2021 respectively. Thus, the 2019 version of ORS § 653.295 applies to Kazlauskas' and Carroll's Confidentiality Agreements, and the 2022 version of ORS § 653.295 applies to Johnson's Confidentiality Agreement. However, because ORS § 653.295(4)(b) is identical in both versions of the statute, the Court's analysis does not differ.

of the employers" from the requirements of ORS § 653.295(1).  However, at that time, the Court did not

have the benefit of defendants' additional arguments on this point, which are now addressed.[2]

i.    *Section 2.2 Enforceability*

Defendants rely primarily on *AssuredPartners of Oregon v. Reese* for the proposition that

a non-solicitation clause that has the overall effect of preventing a former employee from competing with

their former employer is, in effect, a noncompetition agreement.   No. 6:22-cv-00673, 2022 WL

18028029, at *3 (D. Or. Dec. 30, 2022).  In that case, the employer sued two former employes for breach

of contract based on Restrictive Covenant Agreements that each former employee had entered into.  *Id.* at

*1.  The plaintiff's breach of contract claims were primarily based on a clause labeled "non-solicitation

and non-interference," which provided that one former employer could not, for two years following his

termination, "directly or indirectly 'offer, sell, solicit, quote, place, provide, renew, or service any

insurance product or service' for any 'Restricted Client,' or cause Restricted Clients to diminish their

business with, or cease or refrain from doing business with AP and its affiliates, subsidiaries, and parent

companies."  *Id.* at *3.  Restricted clients were defined as "any client or prospective client of AP and its

affiliates, subsidiaries, and parent companies" that the former employee "had material involvement in

proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service"

or who the former employee had received confidential information about.  *Id.*

The court held that the "non-solicitation and non-interference" clause was too broad to

fall within the non-solicitation exception described in ORS § 653.295(4)(b).  *Id.* at *4.  Specifically, it

found that the clause defined "Restricted Clients" in a manner that was broader than persons or entities

"who would reasonably be expected to return to the employer when the employer-employee relationship

ended," and prohibited the former employee from causing current or prospective clients to "diminish,

cease, or refrain from doing business" with the employer.  *Id.*  Thus, the court found that the clause, in

effect, was a noncompetition agreement subject to ORS § 653.295(1).  *Id.*

---

[2] Defendants do not appear to dispute the validity of the employee non-solicitation portion of Section 2.2.  Thus, the Court maintains its prior holding that Venturi has demonstrated a likelihood of success on the merits on its breach of contract claim against Kazlauskas as based on employee solicitation.

On its face, Section 2.1 of the Confidentiality Agreement appears broader, in some respects, than that described in *AssuredPartners*. It prohibits the Former Employees from contacting *any* Venturi customer, including prospective customers, and contains no limitation related to the employees' actual interactions with the customers. However, the court's focus in *AssuredPartners* was whether the customers included in the non-solicitation clause could be understood as those "who would reasonably be expected to return to the employer when the employer-employee relationship ended." *Id.* at \*4. This language was drawn from *Oregon Psychiatric Partners, LLP v. Henry* ("*Henry I*"), 293 Or. App. 471, 429 P.3d 399 (2018), a case in which the Oregon Court of Appeals expressly discussed the meaning of the phrase "customers of the employer" contained in ORS § 653.295(4)(b).

In *Henry I*, the Oregon Court of Appeals addressed an issue related to an employment contract provision that prohibited a former employee from providing services "directly or indirectly through any person or entity, to any patients who have received services by [former employee] at [employer] or any predecessor entity" for two years following termination within a fifty-mile radius of Eugene Oregon. *Id.* at 473. Though labeled a noncompetition clause, the plaintiff employer argued that the clause fell within the ORS § 654.295(4)(b) non-solicitation exception. *Id.* at 474. The trial court found that the clause did not fall under the exception and granted the defendant's motion for a directed verdict upon finding that the plaintiff had not met the statutory requirements to enforce the noncompetition clause. *Id.*

The Oregon Court of Appeals reversed, finding that the clause was "at least in part enforceable under ORS 653.295(4)(b)." *Id.* at 475. In examining the legislative history underlying the statutory exception, the court found that the legislature intended that ORS § 653.295(4)(b) would "allow an employer to enforce an agreement not to solicit or transact business with persons or entities who would reasonably be expected to return to the employer for the purposes of doing business when the employer-employee relationship ended." *Id.* at 480. Notably, the court clarified that an individual or entity identified as a "customer of the employer" would not, necessarily, depart from that category merely by ceasing to do business with the employer in favor of the former employee's new business. *Id.* This

determination was made, in part, because the "transact business" language of the exception would be rendered meaningless "if a person ceased to be a customer of the employer at the moment that they chose to instead patronize the employee's new business." *Id.* at 480 n.7. Ultimately, the court identified the focus of ORS § 653.295(4)(b) as "the status of the customers at the time that a former employee solicits or transacts business with them, not their status after the employee has successfully acquired their business." *Id.* at 480.

Here, upon consideration of defendants' arguments, the Court finds that a limited portion of the customer solicitation provision in Section 2.2 of the Confidentiality Agreement is, in effect, a noncompetition clause. That is, the prohibiting the solicitation of "identified prospective customers" renders Section 2.2 a noncompetition clause. As the Oregon Court of Appeals identified in *Henry I*, the primary inquiry is "the status of the customers *at the time* that a former employee solicits or transacts business with them." *Id.* In seeking to prohibit the solicitation of *prospective* customers, Section 2.2 operates to prevent the Former Employees from soliciting or transacting business with customers that Venturi has no reasonable expectation of continued business with.

Though defendants argue that Section 2.2's language prohibiting the Former Employees from accepting business from, or "reveal[ing] the name of," Venturi customers goes beyond mere solicitation, the Court disagrees. "Transacting business with" is clearly identified as falling within subsection (4)(b)'s exception and transacting business with a Venturi customer cannot be understood as excluding "accepting business." Indeed, the court in *Henry I* expressly identified this issue, noting that "a prohibition on transacting business with customers . . . may well be something that many experienced business attorneys would have placed in a traditional *noncompetition*, rather than a nonsolicitation agreement." *Id.* at 480 n.7. However, the court acknowledged that it could "construe only the text that the legislature" had given it and found that the statutory text indicated that transacting business with customers formerly serviced by the former employer fell under the exception. *Id.* Further, in this case, the Court understands the prohibition on "reveal[ing] the name of" Venturi customers as relating to the prohibition on the Former Employees' assistance of others in soliciting Venturi customers. It would

render many a non-solicitation clause meaningless and ineffectual if former employees could aid others in soliciting their former employer's customers by identifying such customers for a new employer.

That a portion of Section 2.2 renders it a noncompetition agreement does not end the analysis. As Venturi aptly notes, Oregon law authorizes courts to enforce legal aspects of a contract provision even when it is "partly legal and partly illegal."[3] *Montara Owners Assn. v. La Noue Dev., LLC*, 357 Or. 333, 341, 353 P.3d 563 (2015); *see Henry I*, 293 Or. App. at 481-82 ("[N]othing in ORS 653.295(4)(b) suggests that the legislature intended to preclude partial enforcement of overbroad nonsolicitation agreements."). Thus, Section 2.2 is likely enforceable under ORS § 653.295(4)(b) to the extent it prohibits solicitation of Venturi customers that Venturi had a reasonable expectation would return after the Former Employees resigned, and to the extent that it prohibits solicitation of Venturi employees.

Although this Court found in its prior Order that Venturi had provided adequate evidence to support a likelihood of success on the merits on its breach of contract claims against the Former Employees under Section 2.2, the Former Employees have provided additional declarations and evidence on this issue that must be assessed.

    ii. *Johnson*

The Court previously held that Venturi had presented adequate evidence that Johnson attempted to solicit Venturi customers after she was no longer a Venturi employee, in violation of Section 2.2 of the Confidentiality Agreement. Op. & Order 11. Upon review, the Court finds that the evidence does not support a likelihood of success on the merits of Venturi's breach of contract claim against Johnson based on Section 2.2. Venturi has identified two instances where Johnson allegedly transacted business with Venturi customers. The first was while Johnson was employed at Venturi, and the second was while she was employed at Alliance. As for the first incident, the customer was a homeowner who

---

[3] Though defendants reference *Konecranes, Inc. v. Scott Sinclair*, 340 F. Supp. 2d 1126 (D. Or. 2004), for the proposition that limiting a noncompetition provision to the extent it would be enforceable encourages employer overreach, *Konecranes* was decided fourteen years before the Oregon Court of Appeals conclusively confirmed in *Henry I* that non-solicitation provisions may be enforced to the extent allowed under ORS § 653.295(4)(b).

needed restoration work completed on their home.  Venturi has provided evidence that it serviced this customer in 2022 and the customer reached out to Venturi in April 2023, when Venturi alleges Johnson diverted the customer's business to Alliance.  However, Venturi's allegations do not indicate that this customer would return to Venturi for future services, given that the project was related to an isolated natural disaster.  Therefore, this evidence does not establish that the customer was the type of repeat customer discussed in *Henry I*.  293 Or.  App. at 476.  As for the second incident, Venturi alleges, and Johnson does not deny, that Johnson spoke with a realtor at a house about mold remediation work by Alliance.  Again, Venturi has not provided evidence that this customer was more than an "incidental patron."  *Id.* at 476.  Indeed, Johnson describes her work at Venturi as primarily "providing estimates for insurance covered damage claims to single family houses and condominiums."  Johnson Decl. ¶ 5.  Though she presumably had contact with customers in the course of her work at Venturi, Venturi has not provided sufficient evidence that the customers Johnson interacted with were those that Venturi had a reasonable expectation of returning.  Thus, based on the evidence presently before the Court, Venturi has not demonstrated a likelihood of success on its breach of contract claim against Johnson based on Section 2.2 of her Confidentiality Agreement.

### iii.    *Carroll*

As for Carroll, the Court did not find in its prior Order that Venturi presented adequate evidence that he had violated Section 2.2 of his Confidentiality Agreement.  Op. & Order 11 (finding adequate evidence only that Carroll violated Section 1.2 of the Agreement).  However, Venturi now alleges that there is evidence that Carroll violated Section 2.2 by diverting a new project for a Venturi customer to Alliance, while still employed at Venturi, and that he improperly accessed a Venturi Google Sheet depicting Venturi employee information for the purpose of soliciting Venturi employees.  As for the customer solicitation, this allegation pertains to the same incident already assessed in the Johnson discussion.  For the same reasons already discussed, Venturi has not identified the customer as anything more than an incidental patron.  As for the employee solicitation, evidence that Carroll accessed a Venturi Google Sheet with employee information is not, in and of itself, evidence of employee solicitation.

Therefore, the Court finds that Venturi has not demonstrated a likelihood of success on the merits of its breach of contract claim against Carroll based on Section 2.2 of his Confidentiality Agreement. However, the Court maintains its prior finding that Venturi has provided adequate evidence to demonstrate a likelihood of success on the merits of its breach of contract claim against Carroll based on Section 1.2 of his Confidentiality Agreement.

iv.    <em>Kazlauskas</em>

The Court previously held that Venturi had presented adequate evidence to demonstrate a likelihood of success on the merits of its breach of contract claim against Kazlauskas based on Section 2.2 of his Confidentiality Agreement by alleging that Kazlauskas solicited Venturi customers while employed at Alliance and solicited Venturi employees to accept employment at Alliance. *Id.* The Court maintains its prior holding that Venturi has submitted sufficient evidence to demonstrate a likelihood of success on the merits of its claim that Kazlauskas breached Section 2.2 by soliciting Venturi employees to accept employment at Alliance. Though Kazlauskas alleges that he did not solicit any of the calls from Venturi employees, this is contradicted by Venturi's evidence that he personally coordinated calls and interviews between current Venturi employees and Alliance recruiters. *See* Second Decl. of Derek Middleton ("2d Middleton Decl."), ECF [27], ¶ 18, Ex. D; Decl. of Justin Sellers, ECF [6], ¶ 7.

The customer solicitation issue is less straightforward. Venturi's allegations identify four Venturi customers that Kazlauskas allegedly solicited, and/or transacted business with, in violation of Section 2.2 of his Confidentiality Agreement. Customer A is the same homeowner identified in the prior discussions about Johnson and Carroll. For the same reasons already discussed, Venturi has not identified the customer as anything more than an incidental patron.

However, there is evidence indicating that the other three customers have utilized Venturi's services on an ongoing basis, meaning Venturi likely had a reasonable expectation that these customers would return to Venturi for services following Kazlauskas' resignation. *See* 2d Kazlauskas Decl. ¶ 8 (stating that Customer D "used Venturi as their primary restoration contractor" during his employment with Venturi); Cronin Decl. ¶ 2 (noting that, as a Venturi employee, he regularly worked on

job sites for Customer C); 2d Middleton Decl. Ex. N (filed under seal) (depicting numerous jobs completed by Venturi for Customer B). Kazlauskas disputes the allegation that he solicited Customer C, stating that he was on business in California" on the day a Venturi employee allegedly saw him at a Venturi customer job site. 2d Kazlauskas Decl., ¶ 13. However, absent substantiating evidence of Kazlauskas' location on July 17, 2023, there are, at the least, serious questions regarding whether he solicited this customer. He also alleges that Customer B "reached out directly to [his] colleague, Zak Porter, to see i[f] Alliance would" supply an estimate for a project. Kazlauskas Decl. ¶ 8. However, this does not explain why Kazlauskas was included in email communications about Alliance's estimate. Though certainly not conclusive, this evidence, in combination with Kazlauskas' lack of denial that he participated in this estimate, raises serious questions as to whether Kazlauskas transacted business with Customer B while employed at Alliance.

Although Venturi has already demonstrated a likelihood of success on the merits of its breach of contract claim against Kazlauskas based on Section 2.2 of his Confidentiality Agreement, the scope of Venturi's requested relief requires an assessment of its claims related to Customer D. Though Kazlauskas stated that Customer D "used Venturi as their primary contractor" during his employment at Venturi, there is also evidence that this customer began using Venturi services precisely because Kazlauskas began working at Venturi. *See id.* ¶¶ 5-6 (indicating that the customer had followed Kazlauskas to ATI in July 2015, and then to Venturi in March 2021). On the other hand, Venturi argues that it spent a considerable amount of money facilitating Kazlauskas' relationship with this customer for the purpose of "cement[ing] Venturi's relationship with this important client[.]" Pls.' Reply to Mot. for Prelim. Inj., ECF [60], at 8. Thus, Venturi argues that its subsidization and financing of Kazlauskas' relationship with Customer D has created a protectible interest in Venturi's relationship with the customer.

The only case that Venturi cites to support this proposition, however, is from the Northern District Court of Illinois. *See Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943 (N.D. Ill. 2007). In that case, the court was applying Florida law, which affords much greater leeway to employers in the noncompetition and non-solicitation context than Oregon law. Under Oregon law, the Oregon Supreme

Court has stated:

> "Salesmen and solicitors come into actual contact with the customers; they deal directly with them.  In making sales their own personalities are expected to and do enter into the matter; their success as salesmen, in large measure, often depends upon their establishing a good will between themselves and the customers.  Their employer, who pays them a salary for this purpose, is entitled to the good will which they so establish, and to be protected therein insofar as it may be reasonably necessary to his interests."

*Kelite Products v. Brandt*, 206 Or. 636, 652, 294 P.3d 320 (1956).  Thus, to some extent, it appears that Oregon law recognizes a protectible employer interest in customers that an employee has a relationship with, provided that the employer subsidizes the development of that relationship.  However, in the context of Customer D, the Court is now unpersuaded that Venturi could have had a reasonable expectation it would return to Venturi following Kazlauskas' resignation.

It is undisputed that Venturi invested time and resources in growing Kazlauskas' relationship with Customer D.  However, Kazlauskas did not begin his relationship with this customer while at Venturi—rather, he has been related to this customer, in some way or another, since 1998.  Indeed, Customer D followed Kazlauskas to ATI in 2015, followed him to Venturi in 2021, and seemingly has now followed him to Alliance.  While Venturi may have facilitated Kazlauskas' relationship with this client for two years, that evidence pales in comparison to the twenty-one-year relationship Kazlauskas already had with Customer D when he joined Venturi.  Thus, Venturi has not, at this stage, provided sufficient evidence that it had a reasonable expectation that this customer would return to Venturi upon Kazlauskas' resignation.

However, for the two customers that Kazlauskas denies soliciting, Customer B and Customer C, Venturi has presented adequate evidence to demonstrate a reasonable expectation that the customers would return to Venturi for services following Kazlauskas' resignation.  Thus, Venturi has demonstrated a likelihood of success on the merits of its breach of contract claim against Kazlauskas based on the customer solicitation portion of Section 2.2 of the Agreement.

2.    *Intentional Interference*

Venturi also alleges intentional interference with contractual relations and prospective

business advantage claims against all defendants.  Under Oregon law, an intentional interference with contractual relations claim and intentional interference with prospective business advantage claim both require: "(1) the existence of a professional or business relationship . . ., (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995) (setting forth elements for intentional interference with contractual relations claim); *see Allen v. Hall*, 328 Or. 276, 974 P.3d 199 (1999) (applying same elements to intentional interference with prospective business advantage claim).

In its prior Order, this Court found that Venturi had demonstrated a likelihood of success on their intentional interference with contractual relations claim against Kazlauskas based on evidence indicating that Kazlauskas had solicited Venturi employees to leave their positions in favor of positions at Alliance.  For the same reasons that the Court found Venturi's evidence of Kazlauskas' solicitation of Venturi employees adequate to support Venturi's Section 2.2 breach of contract claim against him, the Court similarly finds that Venturi has presented adequate evidence to demonstrate a likelihood of success on its intentional interference with contractual relations claim against Kazlauskas.  However, the intentional interference with prospective business advantage claim merits further review.

The Former Employees argue that these claims do not have a likelihood of success because the Former Employees refute all allegations of interference with Venturi's contractual relations and prospective business advantage and allege that they have not engaged in "wrongdoing" that would amount to intentional interference through improper means or for an improper purpose.

 The Former Employees' argument goes to the third element of the tortious interference with prospective business advantage claim, the improper means or improper purpose inquiry.  The Oregon Supreme Court has identified "improper means" as those that are "wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209-10, 582 P.2d 1365 (1978). Essentially, the allegedly improper means "must be wrongful in some manner other than simply causing

the damages claimed as a result of the conduct." *Douglas Med. Ctr., LLC v. Mercy Med. Ctr.*, 203 Or. App. 619, 634, 125 P.3d 1281 (2006).

In its prior Order, this Court found that Venturi had demonstrated a likelihood of success on the merits of this claim through evidence that the Former Employees utilized improper means by "using Venturi's confidential and proprietary information to solicit Venturi customers while employed by Alliance." Op. & Order 11.

Venturi's first alleged basis for this claim is the incident with Customer A, discussed in the breach of contract section. However, unlike the breach of contract claim, additional discussion is merited for this incident in relation to the intentional interference claim. Venturi alleges that Customer A contacted Venturi in April 2023 to continue demolition and mitigation work on his home that Venturi had begun in November 2022, and the Former Employees, while still employed by Venturi, brought Alliance onto the project as a subcontractor toward the end of May 2023. However, Venturi alleges that it has no records in its systems of work for this customer from April 2023, nor has it received an invoice for this project. Thus, Venturi alleges that the Former Employees wrongfully diverted the customer's business to Alliance.

Because this allegation refers to actions that the Former Employees took as Venturi employees, the third-party element of the intentional interference with prospective business advantage claim is implicated. The Oregon Supreme Court has held that "when an employee acts within the scope of employment, that employee is not a third party to a contract between the employer and another for the purpose of the tort of intentional interference with economic relations." *McGanty*, 321 Or. at 543. An employee acts within the scope of their employment if (1) the act occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least partially, by a purpose to serve the employer; and (3) the act was of a kind which the employee was hired to perform. *Chesterman v. Barmon*, 305 Or. 439, 442, 753 P.2d 404 (1988). Here, it is unlikely that the Former Employees' alleged conduct was motivated by a purpose to serve Venturi, nor is it likely that the Former Employees were hired to perform such actions for Venturi. Thus, they may be considered third parties for

purposes of the intentional interference claim.

The question then becomes whether there is sufficient evidence that the Former Employees used improper means or had an improper motive for their alleged conduct. As alleged, Venturi has likely provided sufficient evidence of improper means given that the allegation is that the Former Employees utilized Venturi's confidential information, namely, the customer information and pricing information for the project, to divert Customer A's business to Alliance. Using their position as Venturi employees to divert business to another competing business would likely violate an established standard of the Former Employees' professions.

Before turning to the likelihood of success on the merits of this basis of Venturi's claim, the Court must first address the conflicting evidence on the record regarding whether the alleged conduct even occurred. Venturi alleges that it "methodically documents the existence of customer jobs as well as progress on each estimated and scheduled project." 4th Parrotte Decl. ¶ 5. Yet, Venturi has provided evidence that it possesses no record of any work completed for Customer A related to the April 2023 inquiry. *See* Middleton Decl. ¶ 31, Ex. M. Thus, Venturi alleges that the Former Employees must have failed to enter information regarding the project into Venturi's systems because they diverted the project to Alliance.

However, the Former Employees specifically deny diverting this project to Alliance and allege that Venturi "marked up the work that Alliance performed, and made a profit on [the] job." Johnson Decl. ¶ 11; 2d Carroll Decl. ¶ 17; 3d Kazlauskas Decl. ¶ 4. Additionally, Johnson provided evidence that when the customer contacted her on June 16, 2023 regarding next steps after demolition work was completed, she directed the customer to Venturi for further assistance. Second Decl. of Olivia Johnson ("2d Johnson Decl."), ECF [70], ¶ 3, Ex. A. Kazlauskas similarly provided evidence that the customer contacted him on July 14, 2023, as well as evidence that Alliance generated an invoice to Venturi for work on the project on June 20, 2023. 3d Kazlauskas Decl., Exs. A, B. Finally, Alliance submitted a declaration stating that "Alliance's records reflect that it completed the project . . . as a Venturi subcontractor and the Account Name associated with this project in Alliance's systems is 'Venturi

Restoration.'"  Kambs Decl. ¶ 4.

To be sure, there are discrepancies in the evidence presented on both sides.  Venturi has presented evidence that the Former Employees did not log the project in Venturi's systems despite taking numerous steps in the progression of the project and bringing Alliance on as a subcontractor.  However, Venturi has not presented evidence affirmatively supporting the allegation that the Former Employees diverted the project to Alliance either.  On defendants' side, the Former Employees deny Venturi's allegation, but provide no reason or explanation for why the project is not logged in Venturi's systems or why they did not notify anyone at Venturi about this project.  Nor do Johnson or Kazlauskas explain why the customer reached out to them rather than Venturi when discussing next steps for the project.

On balance, the Court finds that, despite the Former Employees' submitted evidence, serious questions remain as to the merits of Venturi's intentional interference with prospective business advantage claim against the Former Employees.

3.    *Computer Fraud & Abuse Act*

In its prior Order, this Court found that Venturi presented adequate evidence that Carroll had accessed Venturi-owned material after he was no longer a Venturi employee in violation of the CFAA, and that Kazlauskas had violated 18 U.S.C. § 1030(a)(5)(C) by intentionally accessing a protected computer without authorization and, as a result, caused damage and loss.

Venturi maintains its allegation that Carroll exceeded his authorization to use Venturi's computer systems by using it, prior to his resignation, to transfer control of Venturi's Google Sheets to his private email account for Alliance's benefit, thereby obtaining and altering information from a protected computer in violation of 18 U.S.C. §§ 1030(e)(6), 1030(a)(2)(C).  Further, Venturi alleges that Carroll violated both provisions by continuing to access Venturi's computer systems after his resignation by allegedly continuing to use Venturi's laptop to access and obtain information from Venturi's computer systems.  Venturi also maintains its allegation that Kazlauskas violated 18 U.S.C. § 1030(a)(5)(C) by accessing Venturi's protected computer after he had resigned from Venturi for the purpose of destroying Venturi's data by resetting the laptop to its factory default setting.

The Former Employees now argue that Carroll does not have, and has not had, access to a Venturi laptop since he returned his computer on his last day of employment, June 2, 2023. 2d Carroll Decl. ¶ 12, Ex. C. Kazlauskas similarly alleges that he does not have access to a Venturi protected computer. 2d Kazlauskas Decl. ¶ 11. Both Carroll and Kazlauskas deny having access to any Venturi computer systems that would result in damage or loss to Venturi. *Id.*; 2d Carroll Decl. ¶ 16. Thus, defendants argue that Venturi is unlikely to succeed on the merits of this claim and a preliminary injunction is not warranted for anticipated violations.

Upon review, the Court now finds that Venturi has not provided adequate evidence that Carroll violated 18 U.S.C. §§ 1030(a)(2)(C) or 1030(e)(6) by transferring control of the Google Sheets to his personal email address while employed at Venturi. Though not addressed by the parties, *LVRC Holdings LLC v. Brekka* contains significant factual similarities to Venturi's allegations that cannot be disregarded. In that case, an employee used a company computer to email the company's confidential information to his personal email address prior to resigning from the company. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1129-30 (9th Cir. 2009). The company sued, alleging that the former employee had violated 18 U.S.C. § 1030(a)(2) and (4) by exceeding his authorized access to its computer systems. *Id.* at 1130.

The Ninth Circuit held that the phrase "exceeds authorized access" was defined as a person who "has permission to access the computer, but accesses *information* in the computer that the person is not entitled to access." *Id.* at 1133 (emphasis added). Thus, the court found that the former employee had not violated 18 U.S.C. § 1030(a)(2), (4) by sending the confidential information to his personal email address because he had done so while still employed by the company, and "he accessed documents or information to which he was entitled by virtue of his employment." *Id.* at 1135. The court expressly rejected the argument that an employee could lose authorization to use a company computer by acting contrary to the employer's interest. *Id.* at 1134-35.

Given the strikingly similar facts between *LVRC Holdings* and the present case, the Court finds that Venturi is unlikely to succeed on the merits of its CFAA claim against Carroll, as based on his

conduct in transferring the Google Sheets to his personal email account while employed at Venturi.

Venturi's remaining allegations against Carroll are related to his access of Venturi's Google Sheets after his resignation through non-Venturi owned computers. The question for these allegations is whether the Google Sheets, standing alone, meet the definition of a "protected computer." The CFAA defines a computer as including "any data storage facility or communications facility directly related to or operating in conjunction with such device[.]" 18 U.S.C. § 1030(e)(1). A "protected computer" includes "any computer 'used in or affecting interstate or foreign commerce or communication[.]'" *Id.* § 1030(e)(2).

Google Sheets is not a database, network, or system that is owned or operated by Venturi. That is, Venturi has no authority to generally grant or limit Carroll's access to Google Sheets in the same way that it may grant or revoke his access to its own computer networks. However, Venturi does have authority to grant or limit access to its Google Sheets specifically. The question then becomes whether Venturi's ability to limit non-employees' access to the Google Sheets is sufficient to make the documents fall under the definition of a "protected computer." The Court finds it unlikely.

Central to this finding is the fact that Venturi's systems and network are not connected to Google Sheets. That is, an individual does not need Venturi credentials to access the Google Sheets—this is apparent from the fact that Carroll could transfer ownership of the documents to his personal email address. If, for example, the Google Sheets were instead Microsoft Excel files stored on Venturi's network, accessing them would require a user to have authorizing credentials to first enter Venturi's computer system. In essence, the Google Sheets are the equivalent of files, which, standing alone, are likely not a "protected computer." That is, the *storage* location of the file is a better determinate of whether a protected computer must be accessed to obtain the file. Thus, Venturi is unlikely to succeed on the merits of its CFAA claims against Carroll.

As for Kazlauskas, defendants have not denied Venturi's allegation that he restored his Venturi laptop to its factory default settings after he resigned from Venturi. Such an action likely falls under 18 U.S.C. § 1030(a)(5)(C), in that it alleges that Kazlauskas intentionally accessed Venturi's

protected computer after his authorization to do so had been rescinded, and such access caused damage and loss. Therefore, the Court finds that Venturi remains likely to succeed on the merits of its CFAA claim against Kazlauskas based on 18 U.S.C. § 1030(a)(5)(C).

      4.    *Oregon Uniform Trade Secrets Act & Defend Trade Secrets Act*

      In its prior Order, this Court found that Venturi had provided adequate evidence that the information contained in the Google Sheets included trade secrets under the OUTSA and the DTSA. Further, the Court found that Venturi had provided adequate information, at that stage, to demonstrate a likelihood of success on its OUTSA and DTSA claims against Carroll.

      Defendants now argue that the information in the Google Sheets are not trade secrets because the information in the sheets does not derive independent economic value because the information is generally known by others in the industry. Further, defendants argue that any other non-physical information or knowledge that Venturi alleges are trade secrets is general knowledge and skill that Carroll acquired through his experience while working at Venturi.

      As for defendants' first argument, they contend that the spreadsheets were not "part of Venturi's secret recipe for performing quality restoration work" and were instead used as "organizational tools." Defs.' Resp. 17. In defendants' view, because any restoration business could create a similar organizational template with similar data, Venturi's Google Sheets do not contain data with independent economic value.

      However, Venturi refutes this argument, alleging that the Google Sheets contain "confidential internal pricing and cost data, customer lists and records, and strategic information." Pls.' Reply 16. Thus, Venturi alleges that this information is "critical to Venturi's business operations and competitive strategies, and it must be kept confidential to protect Venturi's investment in the information." *Id.*

      Upon review, the Court finds that Venturi has provided adequate evidence, at this stage, that the information in the Google Sheets derives independent economic value from not being generally known in the industry. Although defendants argue that restoration industry property managers "tend to

share bids with various restoration companies" for specific projects, sharing a bid does not disclose a company's internal pricing and cost data or strategic information that is unique to that company. Defs.' Resp. 17. Nor does it provide information that the company has gathered about specific customer preferences or priorities, even if the customers themselves are generally known in the industry. *Compare Peterson Mach. Co. v. May*, 313 Or. App. 454, 496 P.3d 672 (2021) (finding that document listing only customer names was not trade secret) *with Kaib's Roving R.PH Agency, Inc. v. Smith*, 237 Or. App. 96, 102-03, 239 P.3d 247 (2010) (finding that information related to customer needs and policies, accumulated over twenty years, constituted trade secret).

Although the *format* of the Google Sheets is organizational, it is the information contained within the sheets that likely constitutes trade secrets. To be sure, a competing business could likely create a similar organizational template relatively quickly; however, it seems unlikely that a competitor could just as easily replicate the information contained within the spreadsheets. Thus, the Court maintains its prior holding that Venturi has alleged sufficient evidence to support a likelihood of success on the merits of its OUTSA and DTSA claims against Carroll.

5. *Breach of Fiduciary Duty*

In its prior Order, this Court found that Venturi had provided adequate evidence to demonstrate a likelihood of success on the merits of its breach of fiduciary duty claims against the Former Employees on the following bases: (1) Kazlauskas' alleged solicitation of Venturi customers, alleged misappropriation Venturi's confidential and proprietary information, and alleged solicitation of Venturi employees; (2) Carroll's alleged misappropriation of Venturi's confidential and proprietary information; and (3) Johnson's alleged solicitation of Venturi customers for Alliance while employed by Venturi.

Defendants offer no new arguments regarding Kazlauskas' alleged solicitation of Venturi employees. Thus, the Court maintains its prior holding that Venturi is likely to succeed on the merits of this claim against Kazlauskas on this basis. Additionally, defendants offer no new arguments regarding Carroll and Kazlauskas' alleged use of the confidential information and trade secrets contained in Venturi's Google Sheets. Therefore, the Court maintains its prior holding that the Venturi is likely to

succeed on the merits of this claim against Kazlauskas and Carroll on this basis.

Defendants only new argument on this claim relates to the incident with Customer A. Defendants argue that Venturi is attempting "to conjure a breach of fiduciary duty out of a convoluted and disputed set of facts" and this is "inadequate to establish a violation of the Former Employee's [*sic*] duty of loyalty." Defs.' Response 18. However, Venturi need not conclusively establish the existence of a claim at this stage—serious questions as to the merits of the claim is sufficient. The Court has already discussed the evidence underlying this alleged incident at length and finds that Venturi has provided adequate evidence to demonstrate that there are serious questions going to the merits of its breach of fiduciary duty claims against the Former Employees on this basis.

In sum, the Court makes the following conclusions:

1. Section 2.1 of Kazlauskas' Confidentiality Agreement, the noncompetition clause, is likely enforceable under Missouri law to protect Venturi's interest in its customer lists.

2. Venturi has provided adequate evidence to demonstrate a likelihood of success on the merits on its breach of contract claim against Kazlauskas under Section 2.1 of his Confidentiality Agreement.

3. Section 2.2 of the Confidentiality Agreement, the non-solicitation clause, is likely enforceable under Oregon law to the extent it prohibits solicitation of Venturi customers that Venturi had a reasonable expectation would return to Venturi for services after the Former Employees' resignations.

4. Section 2.2 of the Confidentiality Agreement is likely enforceable under Oregon law to the extent it prohibits solicitation of Venturi's employees.

5. Venturi is unlikely to succeed on the merits of its breach of contract claim against Johnson, as based on Section 2.2 of her Confidentiality Agreement.

6. Venturi is unlikely to succeed on the merits of its breach of contract claim against Carroll, as based on Section 2.2 of his Confidentiality Agreement.

7. Venturi is likely to succeed on the merit of its breach of contract claim against Carroll, as

based on Section 1.2 of his Confidentiality Agreement.

8. Venturi is likely to succeed on the merits of its breach of contract claim against Kazlauskas, as based on the employee non-solicitation portion of Section 2.2 of his Confidentiality Agreement.

9. Venturi is likely to succeed on the merits of its breach of contract claim against Kazlauskas, as based on the customer non-solicitation portion of Section 2.2 of his Confidentiality Agreement.

10. Venturi is likely to succeed on the merits of its intentional interference with contractual relations claim against Kazlauskas.

11. Venturi has presented serious questions as to the merits of its intentional interference with prospective business advantage claims against the Former Employees.

12. Venturi is unlikely to succeed on the merits of its CFAA claims against Carroll.

13. Venturi is likely to succeed on the merits of its CFAA claim against Kazlauskas.

14. Venturi is likely to succeed on the merits of its OUTSA and DTSA claims against Carrol.

15. Venturi has presented serious questions as to the merits of its breach of fiduciary duty claims against the Former Employees, as based on the Former Employees' alleged diversion of business to a competing entity.

16. Venturi is likely to succeed on the merits of its breach of fiduciary duty claim against Kazlauskas, as based on his alleged solicitation of Venturi employees.

17. Venturi is likely to succeed on the merits of its breach of fiduciary duty claims against Kazlauskas and Carroll, as based on their alleged misappropriation of Venturi's confidential information and trade secrets.

## B.    Irreparable Harm

Defendants argue that Venturi will not suffer irreparable harm in the absence of a preliminary injunction because the Former Employees do not possess any of Venturi's confidential information or trade secrets and have not been in contact with any Venturi customers or employees.

Although it is undisputed that Venturi now retains control of the Google Sheets, Carroll and Kazlauskas both had access to Venturi's confidential information and trade secrets, which they could use to unfairly divert Venturi customers to Alliance.[4]   That is, both Kazlauskas and Carroll had access to DASH, Venturi's customer database depicting "budgets and estimates, property details, work orders and repeat work assignments, job size and billings, pricing and any discounts provided, and collections issues[.]" Middleton Decl. ¶ 13.  Kazlauskas also had access to NetSuite, Venturi's customer database for multi-family customers, which contained similar information.  *Id.* ¶ 14.  This information, particularly the information regarding pricing and Venturi-specific discounts, could be misused to underbid Venturi's projects and negatively impact Venturi's customer relationships.

Though the Court found that Venturi had not demonstrated a likelihood of success on the merits of its breach of contract claim against Carroll as based on the non-solicitation clause, the clause itself is likely enforceable, as modified.  Because an enforceable noncompetition agreement "affords fair protection to a legitimate interest of the former employer . . . a breach of the agreement occasions harm." *Ocean Beauty Seafoods, LLC v. Pac. Seafood Group Acquisition Co.*, 648 Fed. App'x 709, 711 (9th Cir. 2016).  Though the alleged harm may not be speculative, the employer need not allege "actual harm." *Id.* Here, both Kazlauskas and Carroll had prolonged access to Venturi's confidential information that they could use to unfairly compete with Venturi, and "[a]n employee's *knowledge* of confidential information is sufficient to justify enforcement of the noncompete if there is a 'substantial risk' that the employee will be able to divert all or part of the employer's business given his knowledge." *Nike, Inc. v. McCarthy*, 379 F.3d 576, 586 (9th Cir. 2004) (emphasis added).  Such a risk exists in this case, as Venturi has provided evidence of a lasting loss of customer goodwill from Kazlauskas' alleged solicitation of its customers, and it appears likely that the same would result if Carroll breached the Confidentiality Agreement.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).  Indeed, in stating that the Former Employees have "practiced strict compliance with the Court's Order and have not

---

[4] The Court agrees that Venturi has not provided sufficient evidence to show that Johnson had access to confidential information or trade secrets that could irreparably harm Venturi's relationships and goodwill with its customers.

engaged in any contact with Venturi employees or customers to create such harm," defendants appear to acknowledge that such contact *would* create harm.  *Id.* at 18-19.  Defendants' own submitted evidence provides additional support for the loss of customer goodwill that Venturi has experienced.  *See* 2d Johnson Decl., Ex. A (depicting conversation with Customer A wherein Customer A states that Venturi was "unaware of the project"); 3d Kazlauskas Decl., Ex. A (depicting conversation with Customer A wherein Customer A states, "No one told Venturri [*sic*] that we spoke" and "we . . . will be sure to refer Alliance Environmental to our friends and to the [redacted] area overall").

        Though defendants argue that *McCarthy* is inapplicable because the restoration business "is not built on a similar need for forward thinking and innovation as Nike" and "many of the projects that restoration employees work on follow the same process," it does not stand to reason that information regarding Venturi's pricing structure could not be used to unfairly compete with Venturi.  Defs.' Resp. 19; *see Ocean Beauty Seafoods*, 648 Fed. App'x at 711 (finding that *McCarthy* was not distinguishable from present case despite industry differences).  That the Former Employees have ceased such alleged solicitation to comply with this Court's Order does not logically extend to the conclusion that they would not solicit Venturi customers in the absence of an injunction.  Therefore, the Court finds that Venturi has demonstrated a likelihood of irreparable harm if Carroll and Kazlauskas are not enjoined.

        Additionally, the Court maintains its prior holding that Venturi's allegation that Kazlauskas' solicitation of Venturi employees caused a mass resignation sufficiently demonstrates a likelihood of irreparable harm in the form of injured customer goodwill with existing and prospective customers.  Op. & Order 20.

## C.      Balance of Equities and Public Interest

        Defendants argue that a preliminary injunction would be inequitable because Venturi is not presently suffering any harm from a loss of confidential or proprietary information, nor are the Former Employees soliciting Venturi employees or customers.  Further, defendants argue that a preliminary injunction would not be in the public interest because Oregon law "actively refrains from rewarding employers who attempt to take advantage of their employees via overly broad covenants."

Defs.' Resp. 20 (citing *Konecranes, Inc.*, 340 F. Supp. 2d at 1131; *Ocean Beauty Seafoods, LLC*, 648 Fed. App'x at 710-11; *Millennium Health, LLC v. Barba*, No. 3:20-cv-02035-HZ, 2021 WL 1254349, at *10 (D. Or. Apr. 5, 2021)).

As already stated, Venturi has alleged irreparable harm that is likely to occur in the form of lost customer goodwill and customer relationships in the absence of injunctive relief. Defendants have provided no argument as to how injunctive relief would injure or be inequitable to the Former Employees. Additionally, injunctive relief does not undermine the public interest because Oregon law endorses judicial reformation of restrictive covenants, and any issued injunctive relief would limit the non-solicitation and noncompetition clauses to a reasonable scope. Therefore, the Court finds that the balance of equities weighs sharply in Venturi's favor.

**D.      Security**

Defendants argue that Venturi should provide security "in a significant amount to remedy the real harm that the Former Employees will incur if a broad preliminary injunction is entered." *Id.* at 21. Defendants have not identified what harm the Former Employees would incur from injunctive relief. Indeed, defendants have stated that "Carroll has pursued new clients that have not worked with Venturi in the past" and Johnson's new role at Alliance requires her only to "supervise office staff and manage restoration and repair crews." *Id.* at 19; Johnson Decl. ¶ 8. Accordingly, security is waived.

## CONCLUSION

Having found that Venturi is likely to succeed on the merits, or presented serious questions as to the merits, on two claims against Johnson, five claims against Carroll, and five claims against Kazlauskas, that Venturi will likely suffer irreparable harm in the absence of a preliminary injunction, that the balance of equities tips sharply in Venturi's favor, and that injunctive relief is not contrary to public interest, Venturi's Motion for Preliminary Injunction, ECF [43], is GRANTED. The Court ORDERS the following:

1.  Defendants Carroll, Kazlauskas, and Johnson must refrain from all actions in violation of, or that would interfere with, Venturi's confidentiality rights under the Confidentiality

Agreement, including but not limited to disclosing, misusing, or misappropriating for defendants' use or the use of others any confidential or proprietary information or trade secrets of Venturi.

2. Defendants Carroll, Kazlauskas, and Johnson must return to Venturi's counsel all property, documents, files, reports, work product, and/or other materials, that they have in their possession, custody, or control that were obtained directly or indirectly from Venturi or that constitute work product owned by Venturi.

3. Defendant Kazlauskas is enjoined from soliciting Venturi's employees.

4. Defendants Carroll and Kazlauskas are enjoined from soliciting or transacting business with Venturi customers with whom they worked or learned confidential information about while at Venturi, if Venturi had a reasonable expectation that the customer would return to Venturi for services following the Former Employees resignations.

   a. Prior to enforcement of this provision, Venturi must identify the customers that meet this definition and provide evidence supporting the existence of this relationship to the Court. Upon the Court's review of the submitted customers, defendants will be provided with a list of customers who fall under this provision.

This preliminary injunction, with the exception of Section 4, shall become effective immediately. Section 4 shall become effective upon proof of service of the customer list upon defendants. Good cause, justice, and equity support waiving any bond requirement for Venturi. This preliminary injunction shall continue until termination of this action.


IT IS SO ORDERED.


DATED this 25th day of January, 2024.

_Adrienne Nelson_
Adrienne Nelson
United States District Judge